```
 1              IN THE UNITED STATES DISTRICT COURT

 2              FOR THE EASTERN DISTRICT OF VIRGINIA

 3                      RICHMOND DIVISION

 4

 5    ------------------------------------
                                        :
 6    CHRISTOPHER ROBERTS, et al.       :   Civil Action No.
                                        :   3:13CV766
 7    vs.                               :
                                        :
 8    COWAN SYSTEMS, LLC, et al.        :   August 22, 2014
                                        :
 9    ------------------------------------

10

11        COMPLETE TRANSCRIPT OF THE ORAL ARGUMENT

12           BEFORE THE HONORABLE DAVID J. NOVAK

13              UNITED STATES MAGISTRATE JUDGE

14

15    APPEARANCES:

16    Craig J. Curwood, Esquire
      Curwood Law Firm
17    707 East Main Street
      Suite 1025
18    Richmond, Virginia  23219
      Counsel for the plaintiffs
19
      Andrew J. Butcher, Esquire
20    Scopelitis Garvin Light Hanson & Feary
      1850 M Street, NW
21    Suite 280
      Washington, D.C.  20036
22    Counsel for the defendants

23

24              Peppy Peterson, RPR
              Official Court Reporter
25          United States District Court
```

<pre>
 1                P R O C E E D I N G S

 2

 3          THE CLERK:  Civil docket 3:13CV766, Christopher

 4  Roberts, et al., versus Cowan Systems, LLC, Mr. Craig J.

 5  Curwood representing the plaintiffs, Mr. Andrew J. Butcher

 6  representing the defendants.  Counsel, ready to proceed?

 7          MR. CURWOOD:  Ready, Your Honor.

 8          MR. BUTCHER:  Ready.

 9          THE COURT:  All right.  Here's what I thought we

10  would do.  I wanted to start off with, first of all, again

11  thanking both sides for consenting.  I always like to do

12  that.  We like to be user-friendly around here.

13          Number two, I wanted to particularly thank you

14  because I thought this issue is incredibly interesting,

15  and the fact that you have confidence in us, misplaced as

16  it may ultimately be, in trying to resolve this, I

17  appreciate that opportunity.

18          So we put a lot of work into this, so I don't

19  want you all to have to overextend yourselves here today.

20  I thought I would give you some feedback on kind of what

21  I'm thinking so far.  That doesn't mean I'm dug in on

22  this, but I just want to kind of give you my issue on the

23  law.

24          We'll get to the specific plaintiffs down the

25  road, but my general take on this, I thought I would give
</pre>

1  you each a few minutes, if you want to, to give me your

2  oral expressions about why you both think I'm wrong,

3  because I think you're both at extremes, and I want to be

4  more down the middle here a little bit, not by choice

5  because that's what I think the law is.

6          You can both push back on me to the extent you

7  want.  Then I'm going to give you a chance to write up

8  something for me, and then I'm going to ask you to do a

9  stipulation of facts as it relates to what I believe the

10 law here is, and then I think that's the easiest way to

11 move forward, and then I'll give the final ruling on the

12 summary judgment motion.  Does that sound fair to you all?

13         MR. CURWOOD:  That sounds fair, Your Honor.  I

14 would add one question in our mind of where it would have

15 fit in, the next step in this process, because we've got a

16 special order that limited everything to smaller issues.

17         If any portion of the case goes forward, the next

18 step is going to be what I had hoped to do at the very

19 outset which was send out notice -- I don't want to put

20 the cart before the horse.

21         THE COURT:  Why don't you hear what I'm thinking

22 first, and then we'll talk it through, the other

23 processes.  I've already told you that we're going to --

24 if we have to, we're going to try the case on retaliation.

25 So that's already done.  We're not going to revisit that,

1    but on the argument here, it struck me as we've spent a

2    lot of time looking at this stuff and looking at the CFR,

3    and when I'm referring to the CFR this morning, I'm going

4    to be referring to 29 CFR Section 782.2(b)(3), and spent a

5    lot of time looking at that, looking at Mr. Butcher's

6    *Allen* case where I think that he is -- thinks he's hit the

7    lottery on that one.

8            So we've taken a look at that, and on the

9    four-month rule -- and I will tell you, I think the

10    four-month rule here plays a significant role, and I'm

11    going to tell you kind of what my thoughts are as we go

12    forward.

13            Mr. Curwood, at immediate -- at first blush when

14    I got your argument, it seemed to me these fellows didn't

15    drive during your claims period, you ought to win.  That's

16    my -- that was my initial thought, but as we've taken a

17    look at this, you know, the CFR says it's two options on

18    looking about what the duties are of the employee.

19            One is the in-fact provision, but the other one

20    is, of course, in the case of a group of drivers, a

21    driver's helper as well as mechanics, whether they are

22    likely to be called upon in the ordinary course of their

23    work to perform, I guess, the driving, regularly or from

24    time to time.

25            I think your argument really addresses the

1    in-fact thing, the fact that they had not done it, but I

2    don't think it really addresses, in my view, the

3    likelihood prong, that is that they are likely to be

4    called upon.

5          So the question is, well, how is it that you are

6    to determine whether or not an employee is likely to be

7    called upon to do this work, and, of course, the exemption

8    burden of proof is on the defense by clear and convincing

9    evidence, and they have to establish that.

10          From our looking at these cases, nobody has

11    really set out, as far as I could determine, what are the

12    factors that you look at to determine whether somebody

13    reasonably is likely to be called upon, and if you all

14    have some case law, I'd be glad to hear it, but I want to

15    tell you what I think some of the factors are, and then I

16    want to talk to you about how I think the four-month rule

17    factors in, because I think you have to read the two of

18    these together.

19          It seems to me, number one is, it is what is a

20    reasonable expectation of a class of the employees

21    according to the Fifth Circuit, but I wanted to say one

22    thing about your *Allen* case there, Mr. Butcher, because I

23    know you're in love with that case, and that's this:  The

24    Fourth Circuit actually has reached a contrary conclusion

25    in the *Troutt* case, and the Fourth Circuit specifically

1    said in the *Troutt* case that these issues -- when there is

2    a factual question as to whether a particular employee is

3    within one of these covered classifications, the question

4    is to be decided on judicial process and on an individual

5    basis.

6            And the way that I read the *Allen* case, I think

7    -- my point to you is, I think you are making too much of

8    the *Allen* case.  The way I interpret that case is, is that

9    that is a complex case.  The Fifth Circuit kept saying in

10   that case, they kept saying in those unique facts, which

11   I'm interpreting as saying like, look, this is so

12   complicated the district court judge had to come up with

13   something, and because they came up with this idea as to

14   how to look at the group, they're going to roll with it,

15   but I think they wanted to limit it to the complexity of

16   those facts.

17           That doesn't mean there's not some good law in

18   there that we can draw upon, but I don't think it is -- it

19   doesn't stand for the proposition that you say the

20   pooling -- what I'm referring to as the pooling argument,

21   that because they're placed in a pool of drivers that

22   means they don't get to collect, because it's actually

23   contrary to what the Supreme Court has said, too.

24           You don't just look at the titles of people, and

25   the Fourth Circuit says you don't look at them completely

1   as a group in deciding this.

2          I believe, too, if you were to look at the

3   district court opinion in your *Allen* case, since I know

4   you read everything about that case and have been over it

5   multiple times, I think Judge Atlas down there disavowed

6   the *Troutt* case in the Fourth Circuit.

7          Of course, the Fifth Circuit said, you know,

8   well, persuasive is not binding upon us here, so we're

9   stuck with *Troutt*.  So what I'm telling you is, I guess

10  there's some lessons from *Allen*, but I'm not in love with

11  *Allen* like you are.  Let's put it that way; all right?

12  All right.

13         Now, so, then I go back to the question, well,

14  how is it that we are to figure out whether a reasonable

15  employee would believe that they are likely to be called

16  upon to do some driving, and it seems to me that there

17  would be a number of factors, but I would like to hear

18  what your factors are in your written submission, okay,

19  but I'm going to throw out to you what I think are some of

20  these factors.

21         I think number one is, the approach is holistic

22  to the group even though it's individual in terms of

23  application.  In other words, I think that -- I don't know

24  how many people were part of this group.  I'm sure you all

25  know, but let's say it's a hundred people; okay?  And if

1    99 people are being called upon regularly to drive, that

2    tells me that the odds are, of the one employee getting

3    called upon to drive, are pretty high.  You have

4    99 percent chance; right?

5         But if only one person out of that hundred is

6    being called upon to do any driving, it diminishes.  The

7    likelihood of you being called upon is less.  To me,

8    that's one factor.  I think a factor is is that when you

9    are hired, what is the job that you are hired for.  Now,

10   just because an employer describes a job as a driver isn't

11   dispositive, but I think it is a factor, right, because it

12   goes to what a reasonable employee would believe when they

13   are hired.

14        So if the employer says, look, your job may

15   encompass driving and we're going to call you a driver

16   because of that, that affects whether a reasonable

17   employee would believe that.

18        I also think that what the job description is

19   that is given to the employee when they start working.

20   Tell them, look, this is what we're hiring you for, or

21   what the advertisement was when they solicited new

22   employees.  I would think that what the requirements of

23   the job are, the fact that they have to have a CDL is

24   important, right, and that you have to maintain that kind

25   of license would be a factor in that.

```
1           I would think if they're paid different because
2   they have to have a CDL, right -- if somebody without a
3   CDL can get the job, that would tell me that they're not
4   really drivers.  I don't care what the employer is telling
5   them.
6           I would want to know the number of times that the
7   employee drove over the span of the entire time.  So like
8   I know -- I can't remember which one of these fellows did
9   a lot of driving.  One of these folks drove, I think, a
10  thousand times.  So let's say you drive a thousand times
11  for three months, but all of a sudden you don't drive.  It
12  informs me whether you have a reasonable belief that
13  during the time you're not driving, that you may be called
14  upon to do so.
15          It would also tell me that during the time at
16  issue, the claims period, if nobody is driving at all,
17  that would inform me that, again, an employee would have a
18  reasonable belief that they're not going to be called
19  upon.
20          I would also think that the manner of selection
21  that somebody is going to be picked to drive is important,
22  too, whether it's indiscriminate, or maybe it's based on
23  seniority.  So let's say -- let's go back to there's a
24  hundred employees, and the supervisor says, we're --
25  driving is going to be done on seniority.  The new guy
```

1   knows there's 99 other people that's in front of him.  The

2   likelihood of getting down to him, I think, drops.

3           These are just some of the factors, and I also

4   want to know how often, how frequent other members in the

5   pool are driving, and also then the extent of the time

6   since they last drove which then is going to relate to

7   what I think is the four-month rule.

8           Here's kind of -- so all those factors go into

9   play, and I'm sure you all can come up with some other

10  factors, and maybe you have case law that identifies the

11  factors.  We haven't seen any yet, but it seems to me,

12  though, that this is when we flip over to the DOT reg, and

13  the DOT reg is -- the way I interpret it, and just so

14  we're on the same page, it's 49 Federal Register -- what

15  do you have there?

16          MR. BUTCHER:  46 Fed. Reg. 37,902.

17          THE COURT:  All right, yeah, that's it.  I kind

18  of think -- the way I interpret that is is that the

19  Secretary of Transportation is saying, look, at some point

20  we going to have to have some benchmarks here, because how

21  is it that we're supposed to figure this out, because it's

22  not just that the reasonable employee has to figure it

23  out, but the reasonable employer has to figure it out,

24  because there really is the reasonable person standard.

25  So it doesn't matter in my mind whether the employer or

1    employee from my notion.  So I think the Secretary of

2    Transportation is saying, you know what, you don't drive

3    in four months, you're not a driver anymore.

4         It's kind of like baseball.  We put you in the

5    bullpen.  We may call upon you, but if we don't use you

6    for four months, you're not really a pitcher, you're more

7    just a playmate out there in the bullpen, and I kind of

8    think the four-month window is kind of like -- what I'm

9    going to say, an interpretation of all -- some of those

10   factors that I put into, maybe some factors that I haven't

11   seen here yet.

12        And so -- and I also think that they start off

13   with the belief that when -- that an employer acts in good

14   faith, that when an employer designates somebody as a

15   driver and they got a CDL, that they're starting off with

16   the notion that, all right, we're believing that they're

17   going to be a driver, but you have four months to show it

18   to us.  If you don't have them driving within the four

19   months, they're not really a driver anymore.

20        So that's kind of where I'm at.  The question is

21   what happens -- so if they haven't driven after four

22   months, they have to be paid overtime in my view.  The

23   question is on that window, the zero to four months, what

24   happens then.

25        Now, it seems to me there's two other parts of

1    that.  I mean, I think that Mr. Curwood could still, if

2    they wanted to, could argue using these factors, and I'm

3    just listing some off the top of my head, and I really

4    want to get your input about this.

5            Even if they did drive within the four months,

6    that they're still not really a driver looking at some of

7    these factors, or it's *de minimis*, right, because the --

8    you have to -- the defense has to demonstrate it was a

9    substantial amount of work, not just one or two times that

10   would do that, and I think that you look not just in terms

11   of that four-month window then -- so if it's one or two

12   times and within four months, that's still not enough to

13   say it's substantial on it's own.  I think -- or *de*

14   *minimis* on its own.

15           I think you have to look at the context of the

16   entire time period, but not just in context of that one

17   particular employee but based upon everything else that's

18   going on during that time period if we're trying to assert

19   this during the zero-to-four-month mark.

20           But as of right now, I'm kind of looking at we

21   should head off with four months.  That's when the

22   overtime starts getting paid.  They don't get paid

23   overtime within the zero-to-four-month window unless you

24   can show something otherwise there, Mr. Curwood, that it's

25   *de minimis*, and we'll have to go to some factors.

1    If you guys have other factors, I'll be glad to

2  consider them.  I'm just kind of throwing those out to

3  you, but I think it picks up at the four-month mark, and

4  because I think then both the reasonable employee and the

5  reasonable employer then believes that this guy is not

6  going to be called upon to drive, and at that point, the

7  overtime starts getting paid.  So with that, Mr. Curwood,

8  the floor is yours.

9    MR. CURWOOD:  Thank you, Your Honor.  With

10  respect to the four-month rule -- well, actually, I liked

11  your baseball analogy, because I was thinking about

12  something similar as an analogy on the way over here.

13  Your analogy of if you're in the bullpen but you're not

14  pitching, then you're not really on the team, this yard

15  jockey duty assignment versus a route driver assignment is

16  kind of like a closer in the bullpen versus a starting

17  pitcher.

18    They're all pitchers, but you're not expecting --

19  you know, Mariano Rivera never would have expected, even

20  though he was on the team every day, that he was going to

21  be a starting pitcher.

22    He was a closer, and yard-jockeying is a very

23  specialized, very -- skill set.  Not any driver can be a

24  yard jockey, and, you know, that's part of the background

25  that's not necessarily material to whether they are exempt

1    or not exempt, but it is important background for the

2    Court to understand, that there are drivers that Cowan

3    tries to put in as yard jocks that don't even last a day.

4          What these guys have to do, they have to back up

5    tractor trailers at the docks where they have this much

6    space between the next trailer, and they're going back and

7    forth and in and out.  So it is a duty assignment, and,

8    you know, I'll adopt Cowan's position that jockeying is a

9    duty assignment, and we're happy to adopt that because the

10   FLSA is clear under Supreme Court precedent you analyze

11   duties.

12         You don't analyze job titles, which also leads me

13   to your point that, you know, one of the factors might be

14   to look at a job title or to look --

15         THE COURT:  Also the duties, too.

16         MR. CURWOOD:  You have to look at the duties.

17         THE COURT:  I should not have admitted that.  I

18   meant to say this.

19         MR. CURWOOD:  And for -- for what it's worth,

20   I'll --

21         THE COURT:  Let me just make it clear what I'm

22   saying the title means.  The title -- what I'm saying is,

23   is that when a defendant -- or, I'm sorry, when an

24   employee is hired by the defendant, they will, I'm sure, I

25   hope, have a discussion with them about what their job is;

1    right?

2          And if they tell somebody that part of their job,

3    whether they call it yard jockey or they call it lawn

4    mower or whatever it is, that they say, we ask -- we

5    require that you have a CDL, because a component of this

6    job is driving, a reasonable employee would believe I

7    might have to drive during that time period.

8          MR. CURWOOD:  And the reason why that doesn't

9    exactly jive with this yard-jockey situation, Judge, is

10   because companies don't put yard jockeys -- don't put

11   people in the position of yard jockey until they've had a

12   lot of experience under their belt of driving.

13         It's just a natural progression for the skill,

14   highly specialized skill that is a yard jockey position,

15   and our guys have said it and talked about it in some of

16   the depositions which, again, weren't relevant, and is

17   that there are drivers who have been driving for 20 years,

18   and they try jockeying for a day and they can't handle it,

19   send me back out on the road, I need to be out on the

20   street.

21         THE COURT:  The issue is not what they think.

22   The issue is what the yard jockey believes.

23         MR. CURWOOD:  I agree.

24         THE COURT:  It's not a high standard.  Is he

25   likely to be called upon; right?

1    MR. CURWOOD:  Does he believe he's likely to be
2  called upon.
3    THE COURT:  No, does he reasonably expect that he
4  is likely to be called upon is, I think, what the -- the
5  way to interpret that.  It's not subjective.  It's got to
6  be a reasonableness.
7    MR. CURWOOD:  Listening to all those factors and
8  addressing that specific question itself, you know who
9  that's a question for?  The fact-finder, because intent is
10  a finding of fact, Your Honor, and if this case rises and
11  falls on intent --
12    THE COURT:  I disagree with you on that.  You are
13  trying to say it is a subjective intent.  It is a
14  reasonable standard.  I think that as a matter of law, I
15  can make some decisions on the reasonableness as to this.
16  Now, there may be some -- it may have to go to a jury.  I
17  don't know.  That's one of the things I'd like to know
18  from you all.
19    MR. CURWOOD:  It would have to go to the jury if
20  that's the question, because the facts have to be weighed
21  to determine what's reasonable or not.
22    THE COURT:  No.  If the -- if there's no -- let's
23  say that my view of the law is what's going to hold you,
24  and, again, this is not my final answer because I want to
25  get input from the two of you, particularly in writing,

1    after you've had a chance to decipher what I'm saying

2    here, digest it.

3          Let's say that holds, okay.  You all have

4    submitted to me what you believe to be material facts,

5    some in dispute, some not in dispute, okay, and I have to

6    figure out whether they're material or not.  What I'm

7    going to ask you to do is go back and do a stipulation of

8    fact between you all as to what you do agree as to each of

9    these gentlemen under my theory if my theory holds, and

10   then also tell me what you disagree on about -- within

11   that time period.

12         Let's say the facts, all the material facts

13   there's no dispute on, I can resolve that on summary

14   judgment.  I just don't know right now completely whether

15   there is a genuine dispute as to material fact.

16         MR. CURWOOD:  Okay.  Well, what I heard you

17   saying is you need to look at more factors than what

18   exactly happened, and our position is, what happened --

19   and what happened was yard jockeys are assigned by the

20   supervisor, the day-to-day person who operates and assigns

21   and schedules, Tom LaPointe, whose depositions you've seen

22   in there, and Tom LaPointe told each one of the

23   plaintiffs, and it's clear and it's undisputed -- Tom

24   LaPointe didn't dispute it -- that to each one at some

25   point he said, you are now a full-time yard jockey, or you

1   are a permanent yard jockey, or you are a yard jockey.

2           And once they were a yard jockey, Your Honor, you

3   see in the evidence, the dispatch records which show

4   movement to and from the Sandston facility, they're not

5   being -- material is not being transported by people who

6   are yard jockeys.

7           THE COURT:  Let me ask you this:  Let's put aside

8   the specific gentlemen at issue here.  Does any yard

9   jockey ever get called upon to drive in interstate

10  commerce?

11          MR. CURWOOD:  I don't believe so, but the only,

12  the only possibility is what's called a rescue mission,

13  and our position, Your Honor, is that a rescue mission

14  does not put them, or at least the evidence hasn't proven

15  that driving a so-called rescue mission puts them in

16  interstate commerce.

17          THE COURT:  But hold on for a second.  This is me

18  trying to figure this out; okay?  That's why I'm asking

19  these questions.  Let's say I were to conclude a rescue

20  mission does put it in interstate commerce, and I'm not

21  saying it does.  I'm saying, what if I did.

22          MR. CURWOOD:  I see.

23          THE COURT:  Okay.  How many yard jockeys have

24  made rescue missions?

25          MR. CURWOOD:  I don't know the answer to that,

1  Your Honor.

2          THE COURT:  Is it more than one or two, or is

3  this a large number?

4          MR. CURWOOD:  I don't know the answer to that.  I

5  mean, I think there's -- I would imagine there's dispatch

6  records and that sort of thing looking at other yard

7  jockeys --

8          THE COURT:  So there's also --

9          MR. CURWOOD:  But let me clarify --

10         THE COURT:  Hold on a second.  If I rule in your

11 favor on the rescue, is there no other type of actions by

12 the yard jockeys that affect interstate commerce?  Is it

13 all about whether a rescue mission is, indeed, affecting

14 interstate commerce?

15         MR. CURWOOD:  That's right, Your Honor, because

16 the way that Cowan handles and the way the yard jockeys

17 are told and the way the yard jockeys understand it is

18 that they're jockeying on the lot, and on the lot is

19 behind secured fencing, not accessible to the public.

20 They stay on private property at all times.  They don't

21 leave the property.  The trucks that they drive aren't

22 made to go off the property.

23         THE COURT:  Let's assume their actions on the

24 property are not going -- that's not going to sway me.

25         MR. CURWOOD:  Right.

1           THE COURT:  But what I'm asking is, are there

2    other actions that are beyond the lot other than the

3    rescue --

4           MR. CURWOOD:  The only thing you could look at,

5    Judge, is the rescue mission and the time that they were

6    told, hey, we just got hired at Lumber Liquidators, we

7    need jockeys down there, drive to Hampton and be a yard

8    jockey, and there's evidence on the record that on the

9    daily logs, it's like an hour, hour and a half.

10          It's a commute down to Hampton, and Coca-Cola

11   doesn't deliver product to Lumber Liquidators, okay, so

12   they weren't transporting anything.

13          So to answer your question, Your Honor, I'm not

14   aware of anything other than potential rescue mission.

15   And also, there's facts, and it's undisputed, Your Honor,

16   that Coca-Cola requires a minimum staffing of yard

17   jockeys, and Cowan's basis or background of stating that

18   we're a just-in-time provider, we have to be able to do

19   anything at any time and ship, that's the reason.

20          They don't say this, but that's the reason why

21   there has to be a minimum staffing of yard jockeys,

22   because if there's not product being loaded and unloaded,

23   that plant shuts down, and Cowan, you know, takes it on

24   the only angle they want to take it from and say, that

25   means anyone should be able to drive at any time.

1          Well, if there's no jockey there -- and, again,

2     this is specialized skill.  Not anyone can just come in

3     and be a jockey.  If there's no jockey there to unload a

4     loaded truck that comes in or to carry away a load that's

5     about to go out, then that plant shuts down.

6          THE COURT:  That doesn't exclude -- I'm taking

7     your position.  Let's say they've got ten yard jockeys

8     there, and they have a driving mission that has to occur.

9     They peel off one yard jockey to do, let's say, a rescue

10    mission.  There's nine other yard jockeys there to unload.

11         That doesn't mean -- just because they need a

12    certain number of yard jockeys to unload, that doesn't

13    exclude the fact that they could be called upon to do

14    interstate commerce runs.

15         MR. CURWOOD:  And this is why I'm saying it is a

16    fact question, Your Honor, because a hypothetical that --

17    you know, Cowan's argument is essentially a hypothetical

18    saying we could at any time, but the reality is they don't

19    at any time, and, number one, first and foremost is the

20    evidence shows they don't at any time.

21         Number two is the reason they don't is because

22    they have to have minimum yard jockeys, okay, and your

23    hypothetical, well, if they have more than minimum, well,

24    they typically -- my understanding is they typically don't

25    have more than minimum, and on top of that, if the only

1    possibility is they get peeled away to do a rescue, then,

2    okay, look at over the course of the time when they

3    started the yard jockey position, how many times did they

4    do rescue missions.  Corey Green, zero; Chris Roberts,

5    zero; David Oakes, zero; Charles Jones, two in three

6    years; Bruce Brooks, two, maybe three in three years.  All

7    right.

8            Again, you mentioned it earlier, we're in the

9    Fourth Circuit.  *Troutt*, least of all, carries the day,

10   and *de minimis* carries the day on that argument.

11           So the reality, Your Honor, is that yard jockeys,

12   as a duty assignment, perform yard jockey duties and don't

13   get assigned routes, delivery routes, and that's something

14   that, you know, there was a big issue over Charles Smith's

15   declaration.

16           Charles Smith is a dispatcher.  He dispatches

17   drivers, route drivers on the routes.  Yard jockeys don't,

18   and, you know, Charles Smith is helpful because the

19   plaintiffs can say so, but, you know, then defendant would

20   say, well, plaintiff is saying something self-serving, but

21   the plaintiffs know and they testified and they will

22   testify that when they're yard jockeys, they're not sent

23   out on a route.

24           And that brings me to one other point, Your

25   Honor.  While you were addressing your thoughts on this,

1    you were saying that you do have to look at the whole

2    period, and then from there you break it down to four

3    months.

4              I disagree totally as to when the start point is

5    for looking, and you have to look at the duties

6    assignment.  This is, at the end of the day, an FLSA case.

7    The law is clear in FLSA cases.  You look at duties, you

8    don't look at job title.  It doesn't matter that Cowan

9    requires as a qualification of all its employees to have a

10   CDL license.

11             THE COURT:  Well, no.  It's a factor in what a

12   reasonable employee would believe, because you only want

13   to talk about the first prong, the in-fact.  There's a

14   second prong, and it's likely -- I mean, it's clear --

15             MR. CURWOOD:  Is he likely to be called upon.

16             THE COURT:  So how do I figure out what's likely?

17   How do I figure that out?

18             MR. CURWOOD:  Well, the first point you look at

19   is the facts, and then if you want to go from there and

20   then say after that look at what the job title says, I

21   disagree with that for the very reason that this is coming

22   from an FLSA reg, and in FLSA, the premise is you look at

23   duties.  You don't look at job titles.

24             So it is irrelevant as to whether or not they are

25   exempt from overtime what their job qualifications

1  according to the employer is.

2         THE COURT:  I disagree with that completely.  Not

3  in terms of the likely.

4         The problem is is that you equate in fact with

5  likely.  You think everything is about whether or not they

6  drove, and that ends the equation, and I disagree with

7  that, because that would write out that part of the CFR.

8         MR. CURWOOD:  Well, I also think that it's what

9  the expectation is of the employee.

10        THE COURT:  The reasonable expectation.

11        MR. CURWOOD:  Sure.

12        THE COURT:  That has to be some kind of legal

13 standard, and that's going to require some kind of factors

14 that I have to turn to.  Do you have case law that talks

15 about what the factors are for likely to be called upon to

16 do something?

17        MR. CURWOOD:  No, but I have -- I found a case

18 that leads to the -- that takes the position that it's the

19 employees' expectation which could be determinative, or at

20 least it's an individualized driver-by-driver expectation.

21        THE COURT:  It's an individual analysis, but it

22 still has to be a reasonable expectation.

23        MR. CURWOOD:  Yeah.  I mean, whether it's right,

24 whether that expectation is reasonable, yeah.  It has to

25 be reasonable.

1          THE COURT:  Look, I'm hoping to hit the Powerball

2     here, but I don't know how reasonable that is.  I mean,

3     that's a subjective view in my mind.  Just because I hope

4     it doesn't mean it's going to happen.  The employee has to

5     be reasonable.

6          But let me go back to my -- let me just switch

7     channels for a second; okay?  What's your reaction to my

8     thought on the DOT reg?  Am I right to believe that you

9     are willing to take anything beyond the four months -- it

10    seems to me like four months and over, like we don't even

11    have to do the analysis.  It's the zero to four months

12    that I have to do the factors.  Do you agree with that?

13         MR. CURWOOD:  And just so I'm understanding, and

14    you're saying you do it on a week-by-week basis in the

15    zero to four months or if there's any interstate activity

16    whatsoever in the four months?

17         THE COURT:  Okay.  After four months, that tells

18    me that they're not a driver, because they are no longer

19    under the jurisdiction of the Secretary of Transportation.

20    So then, within the zero-to-four-month range, I have to

21    find out whether they had a reasonable expectation or not

22    that they were likely to be called upon.  That's where

23    also you would do the *de minimis* argument as well.

24         MR. CURWOOD:  But are you saying you would have

25    to do that analysis within the zero to four months to find

1    out if they are exempt in that four-month period or exempt
2    forever?
3              THE COURT:  Exempt within the four-month period.
4              MR. CURWOOD:  Okay.
5              THE COURT:  If they are over the four months,
6    they're not a driver in my mind.
7              MR. CURWOOD:  That's right.
8              THE COURT:  So the question is -- so my thought
9    is is that if they haven't driven in four months, you have
10   a winner past four months no matter what.
11             MR. CURWOOD:  Okay.
12             THE COURT:  The question is, could you still
13   argue within the zero to four months.  I think the answer
14   is you could still argue it, and I think then it has to
15   be, well, what is your argument hinged on.
16             One is the *de minimis* argument, right, and even
17   beyond the *de minimis* then, I think we go -- I think the
18   *de minimis* is part of the other factors, and I listed
19   some, and my list, by the way, that I start off with is
20   not meant to be conclusive at this point.  I'm still
21   trying to figure this out.  I'm asking you to give me
22   factors.
23             What I'm saying is, within the zero to four
24   months, you can say, you know what, they still weren't a
25   driver for -- you know, you're hung up on what the actual

1   duties were and what the facts are, didn't drive.

2          I think it's beyond that, right, for the zero to

3   four months, because it goes to what they reasonably

4   expected.  I still think you can make the argument.  I'd

5   like to know what the factors are.  I need to know what

6   the factors are before I can apply it to your guys; right?

7   You've given me all the facts on your guys, but I want to

8   know what the criteria is going to be first.

9          MR. CURWOOD:  First and foremost, my position is

10  that to the extent the Court ends up ruling that if

11  there's no driving in four months and after the four

12  months they're not a driver, then our position is there's

13  no way they can be expected, because before you get to the

14  likely to be expected, you have to be part of the group of

15  drivers.  I mean, it's actually that.  You can't be a part

16  of a group of something which you're not.

17         THE COURT:  Let me reword your argument.  What

18  you're saying is is necessarily because they weren't

19  called upon during that four-month time period, they never

20  reasonably expected it during that time period then;

21  right?

22         MR. CURWOOD:  Yes, but what I actually was trying

23  to say, which was another way of getting the same result,

24  is they weren't drivers.  I mean, if they're not drivers

25  as defined by the Motor Carrier Act, Judge, they're not

1    exempt from the Fair Labor Standards Act.

2             If you're not a driver of the Motor Carrier Act,

3    you can't be part of a group of drivers who is likely to

4    be expected.  You can't read the likely to be expected in

5    a vacuum.  It's a group, part of a group of drivers who

6    are likely to be expected to drive in interstate commerce.

7             So absolutely, if the Court ends up finding that

8    they're not a driver once that four-month period goes

9    where they've never driven, then they can't ever be

10   reasonably expected beyond that four months, Judge.

11   Because -- they're not a driver; therefore, they cannot be

12   part of a group of drivers.

13            THE COURT:  Let me just -- I just want to make

14   sure I'm understanding what you are saying.  So my really

15   fundamental analysis, past four months, definitely getting

16   overtime.

17            MR. CURWOOD:  Yes.

18            THE COURT:  I'm guessing you agree with that.

19            MR. CURWOOD:  Yes, sir.

20            THE COURT:  Okay.  Zero to four months, there's

21   still an analysis that goes on in between.

22            MR. CURWOOD:  Yes, sir.

23            THE COURT:  Part of it is *de minimis*.  Part of it

24   also is what I want to say these factors.  I'm kind of

25   making these up as we go.  And are you agreeing with that,

1   or you are just saying you just want to go all is in fact.

2   Just because they didn't drive at all, that means they get

3   overtime.

4           MR. CURWOOD:  Well, to parse it down just a

5   little further, for at least two of the plaintiffs, that's

6   not going to make a difference because at least Corey

7   Green and, I believe, Bruce Brooks, they had not been

8   driving for four months prior to the beginning of the

9   statutory -- statute-of-limitations period.

10          So there's not -- for some of the plaintiffs --

11   and I might be wrong about Brooks, but I'm definitely not

12   wrong about Corey Green.  There's not going to be any form

13   of analysis for at least one of the plaintiffs.

14          My primary view -- well, if the Court ends up

15   ruling in the fashion that you just laid out, you've

16   already heard what my argument is about that, and you want

17   to hear from us as to what the factors are.

18          THE COURT:  I'm not wedded to that.  I'm just

19   trying to think, here's where I'm at at this stage, and

20   I'm getting your feedback, and I'm more than willing, if

21   you want to, to say you want to think about it and you

22   want to write something about that.  I'm sure that you

23   want to accept my over-four-months-you-get-the-win.

24          MR. CURWOOD:  I do, yes.

25          THE COURT:  So the question is what you want to

1  say about the zero to four months, and he's going to

2  say --

3       MR. CURWOOD:  Here's what I say first and

4  foremost, is that this is a notice of interpretation by

5  the Secretary of Transportation.  It's not in the

6  statutes.  It's not in the FLSA, it's not in the Motor

7  Carrier Act.

8       It's a notice of interpretation by the Secretary

9  of Transportation.  It's -- again, part of the argument we

10  made in the brief.  The secretary doesn't have

11  jurisdiction or can't issue interpretation over class of

12  employers over which it has no jurisdiction.

13       THE COURT:  Right.  Again -- I was going to say,

14  the point, it seems to me, is this:  The interaction of

15  these two statutes is who is to be policing these

16  employees.

17       MR. CURWOOD:  Right.

18       THE COURT:  Is it the Secretary of Labor or the

19  Secretary of Transportation, and the way that I read the

20  interpretation of the Secretary of Labor is is that even

21  if you start off with believing that I'm supposed to be

22  supervising these guys, if they haven't driven in four

23  months, they're not really my guys, they need to go over

24  to the Secretary of Labor; right?

25       And so -- I think you are wrong in saying that

1  that doesn't have value.  It has value to the sense that

2  the Secretary of Labor is saying if I have control of

3  these guys within those four months, I'm definitely

4  surrendering that they don't drive within the four months.

5  The question that you want to raise is is that did they

6  really have control of them in the first four months at

7  all.

8          MR. CURWOOD:  Yes, sir.

9          THE COURT:  And that is -- and I have to figure

10 that out, and I think that there has to be some kind of

11 measuring stick, and there has to be some kind of -- I

12 can't be the first judge in America to ever be called upon

13 to do this.

14         MR. CURWOOD:  Maybe.  I don't know.

15         THE COURT:  I mean, Judge Atlas decided she

16 wanted to do it by the whole company.  In the Fourth

17 Circuit, I don't think that's going to work.

18         MR. CURWOOD:  That's right.

19         THE COURT:  So it seems to me that I need to look

20 at factors, but I think the factors are larger than just

21 the individual employee, because I think if the employee

22 is sitting there seeing his buddies -- and I don't know if

23 this is true or not -- but if his buddies are driving

24 every other day, he's sitting there saying, you know what,

25 my day is probably going to come pretty soon.

1          But if his buddies are never driving and they're

2   doing just the loading all the time and that's all he's

3   doing, he's thinking, nobody gets called on this, and that

4   seems to me to go to what is the reasonable standard.

5          MR. CURWOOD:  It's on account of schedules.

6   There's drivers, and there's jockeys.  Jockeys don't get

7   assigned to routes.  But, you know, let's say that Cowan,

8   instead of saying, we need Oakes, Green, and Roberts to be

9   drivers, instead we need to be janitors.

10          You know, they still have CDLs, but, you know,

11   cleaning floors and sweeping the floors is not a duty that

12   you are exempt for four months from overtime just because

13   the day before they were assigned to janitorial duties.

14          THE COURT:  Totally agree.

15          MR. CURWOOD:  So, you know, that's another reason

16   why, in the plaintiff's view, the Secretary of

17   Transportation ceases having jurisdiction over them the

18   day they are assigned to a duty that doesn't involve

19   safety affecting operations in interstate commerce.  So

20   that's our main argument.

21          The secondary argument is the authority issue, is

22   that we don't -- our position is that the Secretary of

23   Transportation in notice of interpretation doesn't have

24   authority to basically overturn Supreme Court precedence.

25   In the FLSA case laws, it says, you know, you look at

1    duties, and you look at it on a week-by-week basis.

2         THE COURT:  You know, I've got to tell you,

3    you're running away from the Secretary of Transportation.

4    I think he helps you.  Who is the Secretary of

5    Transportation?

6         MR. CURWOOD:  I don't know who it is currently.

7    After four months, yeah.

8         THE COURT:  When you reflect on this, you may be

9    embracing that Secretary of Transportation.  Why don't you

10   give me a chance to talk to Mr. Butcher here, because he

11   is being slighted over.  You are not feeling slighted, are

12   you?

13        MR. BUTCHER:  I'm not, depending on how long you

14   give me here.

15        THE COURT:  I'm going to save you a little bit of

16   time.  Your waiver argument is going nowhere, because what

17   they agreed to in a time period, to me, is -- that's a

18   loser for you.  So let's focus on what you think about my

19   four months, and tell me about how you think the

20   four-month rule interrelates with the FLSA.

21        MR. BUTCHER:  Sure.  So I think you need to look

22   at the broad spectrum of, as you pointed out earlier,

23   either the Department of Transportation is going to have

24   jurisdiction or the Department of Labor is going to have

25   jurisdiction.  It's binary.  You can't have concurrent

1   jurisdiction.

2          It's important to recognize that it's the

3   Department of Transportation if they have the authority

4   to.  It's not necessarily the exercise of that authority

5   but rather if they have the authority to exercise

6   jurisdiction, it's the Department of Transportation.

7          So you start with the Motor Carrier Act of 1938,

8   and you have the FLSA was enacted after that.  The DOL

9   regulations that we've been citing to, and a number of

10  cases cite to them, were first created in 1948.  They

11  weren't amended except for about 1971, slight amendment to

12  it, but have remained the same for the most part.

13         You then have the Secretary of Transportation who

14  comes in 1981 to say, wait a minute, we need to clarify

15  what the contours are, jurisdictions are, and specifically

16  for drivers.  And they provide this four-month example to

17  use, but I don't take it as a strict if it's four months

18  and anything after that they lose jurisdiction.

19         THE COURT:  Isn't that what the secretary is

20  saying?  The secretary is saying they're surrendering

21  control?  What they're saying is -- the way I interpret

22  that is, secretary is saying, look, I've read all this

23  case law, I've looked at what everybody else is saying,

24  I'm deciding that if they haven't driven in four months,

25  I'm not going to police them, I'm sending them over to the

1    Department of Labor.

2           MR. BUTCHER:  I don't think that's what it says.

3    I think it's -- it says if you can show within four months

4    that there's a reasonable likelihood based on the motor

5    carrier's belief that there's going to be movements in

6    interstate commerce and that one of the drivers would be

7    handling one of those movements, that's definitive proof

8    that for that four-month period of time we have

9    jurisdiction.

10          Whether there's something outside of that four

11   months that could impact the analysis, I don't think the

12   Department of Transportation and the secretary weighed in

13   on that point.

14          And there's a couple cases that I think do a good

15   job of explaining this, and the one that comes to mind is

16   the Elliot case from the Southern District of Indiana, at

17   the time, District Court Judge Tinder, now on the Seventh

18   Circuit, that goes through this analysis, I think, just as

19   Your Honor is having the difficulty with, what are the

20   contours and fine lines of when jurisdiction transfers

21   from the Department of Transportation to the Department of

22   Labor, and it walks through the Department of Labor

23   regulations in 782, compares them to the Department of

24   Transportation interpretation from 1981, and I'll note

25   that, as Mr. Curwood had said, that the Department of

1  Transportation interpretation is not in the federal regs.

2        As Judge Tinder pointed out in a footnote in the

3  *Elliot* case, the reasons that didn't happen are unknown as

4  to why it didn't happen.  I don't know if it was a clerk

5  issue or what, but what Judge Tinder went on to say,

6  though, is that he compared -- he looked at the four-month

7  issue and then said, I don't even have to deal with this,

8  because what we look at is a reasonable expectation that

9  there would be driving in interstate commerce.

10        And there was a reasonable expectation because

11  there was interstate loads being handled, and any one of

12  the drivers could have taken one of those loads.  A number

13  of cases get hung up on this idea of, well, was it

14  indiscriminate, and as Judge Tinder points out -- I

15  believe it's also in the *Chao* case from the Middle

16  District of Florida, what was likely intended there was,

17  what does indiscriminate mean.  Someone said from time to

18  time.

19        Really, it's just a matter of were they -- did

20  they have the potential to, a reasonable expectation to

21  drive in interstate commerce.

22        THE COURT:  I disagree with the way you are using

23  indiscriminate.  I think that if they have a formal system

24  set up as to when a yard jockey is going to be called upon

25  to drive, and the reasonable employee knows that he's not

1    going to be called upon, let's say due to seniority

2    purposes -- it could be the most senior guy on the yard

3    always gets called upon first to do the driving because it

4    gives him a break from having to do all the lifting all

5    the time.  Then the young guy knows that the likelihood --

6    let's say there's ten guys there that day, and the

7    likelihood of having nine other guys get pulled off before

8    him is so small, that would tell me that he would have a

9    reasonable belief that he's not likely to be called upon.

10          Do you see what I'm saying to you?  The question

11   is, is it random such that Mr. LaPointe can just go out

12   and say, hey, you, John Smith, today is your day, I'm

13   going to go send you over as opposed to seniority.

14          Normally in work places, seniorities have a

15   pretty significant role, and I don't know if that's true

16   here.  I think it's the opposite.  I think Mr. LaPointe

17   did it on indiscriminate ways, would pick anybody he

18   wanted; right?

19          MR. BUTCHER:  I agree with that, because he did

20   do it in an indiscriminate way.  I think an example here

21   of why the four-month application, where he said, well, if

22   it's zero to four months, after that, there's certainly

23   Department of Labor jurisdiction.

24          The issue that you can run into with the

25   application of that approach is, I believe it was Brooks

1    who, during the claim period the plaintiffs have put

2    together, he may have gone six, eight months without

3    driving but then had to take a load outside the facility.

4         THE COURT:  Yeah, that's not substantial.  One

5    time in six months is not a substantial part of his work.

6    That's what your burden is.

7         MR. BUTCHER:  I think that goes to the *de minimis*

8    argument, and, you know, besides a few outlier cases from

9    district courts, I don't think there's a single case that

10   has found that someone who is doing driving activities

11   falls within the *de minimis* exception.

12        In the *Troutt* case, for instance, it was a loader

13   who fell within the *de minimis* exception.  As we go back

14   to this idea you can't have concurrent jurisdiction, if a

15   driver takes a commercial motor vehicle with a trailer out

16   on the road, there is no question that the Department of

17   Transportation is going to say, we have jurisdiction over

18   this individual.  There's no way you could have the

19   concurrent jurisdiction at that point.

20        So, how do you figure it out?  I think it goes

21   back to this idea of --

22        THE COURT:  You agree it can't be concurrent

23   jurisdiction.

24        MR. BUTCHER:  No, there absolutely cannot be

25   concurrent jurisdiction.

1          THE COURT:  Right.  It's kind of like you're

2     pregnant.  You either are or you're not; right?  You are

3     under DOL or you're under DOT, not both; right?

4          MR. BUTCHER:  That's right.

5          THE COURT:  That's kind of where my thought is.

6     What do you think about my zero to four there are factors,

7     and after four, you are done?  I know you don't like it's

8     done after four.  You already told me that, but what do

9     you think about my zero to four?

10          MR. BUTCHER:  I agree with the idea that you have

11     to look at certain factors objectively, and I think we

12     have gone through a number of those factors in our reply

13     as far as the summary judgment, the fact that they had to

14     comply with DOT regulations, or the intent was to comply

15     with DOT regulations, the job description that was

16     available.

17          It listed a number of factors, and then it cited

18     a number of cases that have found those were indicative of

19     being someone who is going to have a reasonable likelihood

20     of moving an interstate load.

21          THE COURT:  As an individual, though, not as a

22     group.  That's my disagreement with your approach.  You

23     want to take that *Allen* case to where it doesn't belong in

24     the Fourth Circuit.  I think there's some good points in

25     that *Allen* case, but I think it has to be applied on an

1   individual basis, and that's kind of where my -- I already

2   told him what my argument with his argument is, is he's

3   all in-fact and no likely-to-be.  My heartburn with you is

4   you are all group and you are no individual, and it's got

5   to be individual.

6          MR. BUTCHER:  Well, we have five plaintiffs here

7   who, in their complaint, say they are all similarly

8   situated, that they had the same duties as a yard jockey.

9   There have been nothing in the papers that I've seen that

10  would show that one individual is saying he's different

11  than another as far as what their duties are.  So our

12  position would be they're either all drivers and part of

13  that class of drivers or they're not.

14         THE COURT:  We're going to get to the class

15  certification issue here in a little bit.  So here's what

16  I'd like to do, is I'd like to, unless you have something

17  you want to share with me right now, I'd like to give you

18  all -- I believe Mr. Curwood is going on vacation next

19  week; is that correct?

20         MR. CURWOOD:  Yes, sir, starting tomorrow.

21         THE COURT:  Mr. Butcher, what is your

22  availability here in the next couple of weeks?

23         MR. BUTCHER:  I'm also going on vacation

24  September 4th through the 7th.

25         THE COURT:  So if I gave you all two weeks -- I'd

1    like to get your written thoughts about my analysis, and

2    if I go with my zero-to-four-pick-the-factors, either

3    after four months it's either conclusive or it could be

4    that you argue it's presumptive and that other factors

5    could overcome the presumption -- I'm not sure about that

6    -- but I'd like to see what your factors would be then and

7    if there's any case law on it, on that zero to four,

8    because I think the four-month rule interrelates with the

9    CFR, and I want to try to see how that plays out then, and

10   then -- so can you give me something in two weeks, because

11   that's before you go on vacation?

12           MR. BUTCHER:  It is, Your Honor.

13           THE COURT:  Is it all right?

14           MR. BUTCHER:  That will work.

15           THE COURT:  That gives you a week.  You'll be so

16   rested, though.

17           MR. CURWOOD:  I'm not going to think about the

18   Motor Carrier Act next week, Your Honor.

19           MR. BUTCHER:  I would like to add also the idea

20   that there's a number of cases -- the *Starrett* case out of

21   the Tenth Circuit comes to mind -- which you find that

22   there are not drivers -- there are drivers who didn't do

23   any kind of driving in interstate commerce, but, yet, were

24   still found to have been exempt under the Motor Carrier

25   Act.

```
 1            THE COURT:  I'm with you on that.  What I'm

 2   saying to you is, I'm agreeing with you that it's not just

 3   whether that individual person did driving.  That's the

 4   first option, the in-fact.

 5            You're not going on that.  You're going on the

 6   likely-to-be prong.  So then I think you have to look at

 7   the actions of that employee in the context of the other

 8   employees as well to determine if they were likely to be

 9   called upon to do so.  Am I making sense?

10            MR. BUTCHER:  You are, Your Honor.

11            THE COURT:  You can disagree with me.  I just

12   want to make sure that you understand what I'm saying.

13            MR. BUTCHER:  The issue you are presenting I

14   understand.  As far as the briefing goes that you are

15   considering in two weeks, is it going to be -- is that the

16   discrete issue that you --

17            THE COURT:  Right.  I want -- I'm giving you a

18   chance to push back on what I'm thinking right now,

19   because I want to test whether I'm right or not.  If you

20   have any more case law on it, I'd be glad to hear it,

21   because this is kind of where I'm heading to.

22            Your waiver argument is gone, and I'm not going

23   on your pooling argument, but I'm thinking about the zero

24   to four and then break it, and then after four months, if

25   they haven't driven in four months, I think they're not a
```

1    driver.

2           The question is, what do I do with the zero to

3    four, and I think then that's where you get the *de minimis*

4    argument and these factors that play.  I guess *de minimis*

5    is part of the factors to some extent.

6           MR. BUTCHER:  I mentioned the *Elliot* case

7    earlier, the *Chao* case from the Middle District of

8    Florida, the *Badgett* case from Pennsylvania.  Also, when

9    we're looking at the four-month context, there are a

10   number of cases that apply it where it's based on what the

11   employee -- did they haul within the last four months or

12   not, but you also have a few cases -- the *Reich* case from

13   the Ninth Circuit comes to mind -- in which it explains

14   that that four-month concept is based on the objective

15   view of the motor carrier and does the motor carrier have

16   -- are they hauling interstate loads and do they have a

17   reasonable probability of doing that.  I think it's

18   important here --

19          THE COURT:  I think it's a reasonable person -- I

20   think the case law says reasonable employee would believe

21   that they're likely, but I actually think it doesn't

22   matter, because I think the reasonable employee and the

23   reasonable employer would have the same vantage point in

24   terms of figuring out if somebody is likely to drive based

25   upon some of the factors that I'm throwing out there to

1   you.

2          You're going to have more factors, I suspect,

3   than the ones I've just given you, as will Mr. Curwood,

4   but I want to hear what your factors are.  Am I making

5   sense?

6          MR. BUTCHER:  Absolutely.  I would also mention,

7   as we're talking about cases on the four-month issue,

8   you've got the *Reich* decision from the Ninth Circuit

9   talking about the objective view of the motor carrier.

10         You also have the *Songer* decision at the district

11  court level -- it was upheld by the Fifth Circuit -- that

12  also adopts the objective view along with the *Walters*

13  decision from the Middle District of Florida who is upheld

14  by the 11th Circuit, but that decision also goes through

15  and provides guidance on clarifying, and certainly the

16  objective view of the motor carrier based upon language --

17         THE COURT:  I'm with you on the objective view.

18  I mean, I already told them that.  That goes back to me

19  winning the Powerball, whatever it is.

20         MR. BUTCHER:  Maybe.

21         THE COURT:  If I do win, I won't be deciding this

22  issue.  So listen to this.  I'm going to give you two

23  weeks to write that up, and then what I'd like to do --

24  look, I want to be clear.  I'm giving you a chance to push

25  back on this.  If I'm not right, I want to know it.  I

1    mean, look, you have to represent your clients, obviously,

2    but I'm kind of telling you, before I write something, I

3    want to get your input, and really, frankly, to me, that's

4    a compliment to the quality of work that you both have

5    done in this case, because I could have just said --

6    written an opinion and said, this is what we're going to

7    do, but I think you guys have done such a great job here,

8    and I think this area of the law is kind of murky, and

9    knowing the way Mr. Curwood calls his losses every ten

10   minutes, he's going to take whatever I write to go all

11   over the state to be doing this.

12          So I want to get it right, and the best way that

13   I can get it right is to get smart guys like the two of

14   you to test this, file something in writing, and then

15   after that, we'll go from there.  Then what I'd like to do

16   is set up -- I'm giving you two weeks from today's date,

17   close of business, to each file a brief about my thoughts

18   on this; okay?

19          And in particular, even if you disagree on my

20   notion, I'd like to hear what you think the factors are in

21   the zero to four months.  Maybe you also tell me if you

22   think the post four months is definitive or it's just

23   presumptive.

24          And then -- okay.  So once we get that, I'm going

25   to come to some kind of answer, but I'd like you all --

1  after you get done with your vacation, I'd like you all to

2  start thinking about a stipulation of facts that you agree

3  on as to -- that are relevant to my analysis; right?  Even

4  if you disagree with my analysis, here's the facts, and

5  then I'd like you to -- the second part of that filing

6  would be, what are the facts that you are in disagreement

7  about, because that way I can -- and whether you think --

8  I'll figure out whether they're material or not.

9       Does that make sense, because you've given me so

10  much stuff here, I want to just kind of get a hold on it,

11  and then what I thought we would do is target then -- I'm

12  going to rule on all this stuff before the settlement

13  conference.

14       You all wanted me to do the settlement

15  conference, too.  I don't think it's fair to you all to go

16  into a settlement conference without me giving you an

17  answer on this.  I've already given an answer on

18  retaliation.  I've given you an answer on your waiver

19  argument.  So the question is going to be now, how does

20  this play out.

21       The more facts that you agree to -- my guess is

22  you don't disagree on that many facts once you figure out

23  what the analysis is; right?  Your arguments, particularly

24  about the number of times the guy drove outside the claim

25  period and stuff, to me, is a factor as it relates to what

```
 1    a reasonable person would think about during the first
 2    four months.  You may not disagree about what they
 3    actually did; right?  That way I can take that and apply
 4    it to my analysis.  Does that make sense?
 5              MR. BUTCHER:  It does.
 6              THE COURT:  How long would you need to work on
 7    the stipulation of facts?  Are we talking about three
 8    weeks after that?  Because two weeks from today, what is
 9    that, September?
10              THE CLERK:  September 5th.
11              THE COURT:  So right before you go on vacation,
12    you're going to give me the greatest brief ever written on
13    this; right?  And you're going to go off and decompress
14    for a week; right?
15              MR. BUTCHER:  I hope so.
16              THE COURT:  Somewhere good, I hope.  So what's
17    three weeks after September 5th?  September 26th.
18              THE CLERK:  26th.
19              THE COURT:  Do you think you can give me
20    stipulations by September 26th?
21              MR. CURWOOD:  I think so.
22              THE COURT:  We can move the trial date.  We'll
23    deal with the trial date.
24              MR. CURWOOD:  Definitely moving the trial date.
25              THE COURT:  We'll deal with that.  I want to get
```

1    this right, though.  My thought is, if I give you an

2    opinion here, you're going to do what good lawyers do and

3    figure out how to resolve the case once I give you the

4    opinion.

5             This opinion has a broader implication than just

6    these five guys, and that's why I want to get the legal

7    issue right.  Particularly if you have case law on the

8    factors, that's something I would find to be helpful, to

9    be honest with you.  You think, Mr. Butcher, three weeks

10   is enough?

11            MR. BUTCHER:  Absolutely, for the stipulation of

12   facts.

13            THE COURT:  September 26th, okay.  Do you want to

14   shoot for a day for a settlement conference then in early

15   November, because we'll get something out to you in

16   October then.

17            MR. BUTCHER:  Checking here if my client has

18   written an email back to let me know when he's available.

19            THE COURT:  I'm thinking like maybe November 3rd

20   or 4th.  I think those dates are available.

21            MR. CURWOOD:  Is Election Day a federal holiday?

22   I'm available --

23            THE COURT:  We will work.  I'll let you vote, but

24   we still work.

25            MR. CURWOOD:  I'm available either November 3rd

1   or 4th, Your Honor.

2           MR. BUTCHER:  My phone is still firing up.  One

3   second here.

4           MR. CURWOOD:  Am I allowed brief rebuttal on one

5   of the issues you were talking about?

6           THE COURT:  You have 30 seconds while he's

7   looking up his phone.

8           MR. CURWOOD:  The bottom line on the issue of the

9   factors of likely to be called on, many of the cases, if

10  not most of the cases, starting with *Morris v. McComb* in

11  the U.S. Supreme Court, looks at drivers who are assigned

12  interstate routes versus drivers who are assigned

13  intrastate routes.

14          This is apples and oranges to drivers who are

15  yard jockeys.  None of those cases are yard jockey cases,

16  so it's a very important distinction.

17          THE COURT:  Well, you know, but one of the points

18  that you pointed out -- I think in your stipulation of

19  facts, you could include -- I'm not so worried about the

20  stuff at the plant.  I don't think that's -- right now, I

21  don't think that's going to qualify as interstate

22  commerce, but the rescue mission, I'd like to know how

23  many rescue missions and is there something else outside

24  the plant other than the rescue mission.  You can put that

25  into the stipulation of facts.  Really, I'm just asking

1  you to help me distill these facts, because, you know,

2  we've got stacks of stuff here.

3          MR. BUTCHER:  Your Honor, I think we've got down

4  what you want us to focus on, but will there be an order

5  to follow?

6          THE COURT:  Yes.

7          MR. BUTCHER:  In the written order that you will

8  provide, will there be more expansion on what the material

9  facts are that were in dispute on retaliation?  I only say

10  that from the standpoint of mediation or settlement

11  talks --

12          THE COURT:  When I deny summary judgment, I don't

13  do anything else.  You may have heard, I'm the only

14  magistrate judge in town right now, so if anybody deserves

15  overtime in this plan, you are looking at him.

16          If you drove your daughters around as much as I

17  drove my daughters this week, you'd qualify for the Motor

18  Carrier Act exception.  So, I'm just going to have to say,

19  look, I'm sorry, that's as much --

20          MR. BUTCHER:  The 3rd looks fine for me.

21          THE COURT:  Let's set it on the 3rd.  If your

22  client can't make it, then you'll let us know.

23          MR. BUTCHER:  Yes.

24          THE COURT:  Try to let us know as soon as

25  possible.  Notify Frank, my law clerk here.  So what we'll

1    do then is we'll have the settle conference, start at

2    9:30 that day.  We will definitively get you an opinion

3    before that settlement conference.  We'll try to shoot for

4    at least a week beforehand so you can sit down with your

5    client.

6              I don't want -- since you have asked me do the

7    settlement conference, too, I don't want one influencing

8    the other.  I don't think it would be proper.  We'll deal

9    with class certification trial dates thereafter.  I'm not

10   worried about that date.

11             I want to commend you both again for what I think

12   is really exceptional lawyering on what is, I think, a

13   really hard issue, and I hope I will get it right, but I

14   appreciate the opportunity to take a swing at it.

15             MR. BUTCHER:  I wish I would have brought my

16   client again.

17             THE COURT:  She needs you to order the transcript

18   anyway, so you can show what a great lawyer I said you

19   were.

20             MR. BUTCHER:  Thank you, Your Honor.

21             THE COURT:  Enjoy your vacations.

22

23                  (End of proceedings.)

24

25

1

2

3           I certify that the foregoing is a correct

4    transcript from the record of proceedings in the

5    above-entitled matter.

6

7

8    _____/s/_____              _____
     P. E. Peterson, RPR                Date
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25