IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

CHRISTOPHER ROBERTS, *et al.*,　　　)
　　　Plaintiffs,　　　　　　　　　)
　　　　　　　　　　　　　　　　　)
　　　　　　v.　　　　　　　　　　)　　　Civil No.  3:13cv766 (DJN)
　　　　　　　　　　　　　　　　　)
COWAN DISTRIBUTION SERVICES,　　)
LLC, *et al.*,　　　　　　　　　　　)
　　　Defendants.　　　　　　　　　)
_____)

**MEMORANDUM OPINION**

In this case, the Court must interpret whether the Motor Carrier Act Exemption to the overtime requirements of the Fair Labor Standards Act applies to certain employees that performed "yard jockey" assignments at a local Coca-Cola plant.  The matter comes before the Court by consent pursuant to 28 U.S.C. § 636(c)(1) on Defendants' Motion for Summary Judgment (ECF No. 30) and Plaintiffs' Motion for Partial Summary Judgment (ECF No. 35).  On August 22, 2014, the Court held oral argument on the matter.  At the close of oral argument, the Court ordered the parties to file supplemental briefing with a joint stipulation of facts, which the parties timely filed.  Accordingly, the parties have extensively and thoroughly briefed the issues, rendering the matter ripe for decision.[1]  For the reasons set forth below, the Court GRANTS in part and DENIES in part Defendant's Motion (ECF No. 30), and GRANTS in part and DENIES in part Plaintiff's Motion (ECF No. 35).

---

[1]　The Court commends counsel for all parties on their work on both their separate submissions and their joint submissions.

## I. Background

### A. Cowan Systems, LLC

Plaintiffs Christopher Roberts, David Oakes, Corey Green, Bruce Brooks and Charles Jones (collectively "Plaintiffs") have brought suit against their employer Cowan Systems, LLC and its payroll servicer Cowan Distribution Services, Inc. (collectively "Defendants")[2] for claims of unpaid overtime in violation of 29 U.S.C. § 207. (Compl. (ECF No. 1) ¶¶ 36-44.) Defendant Cowan Systems operates as a motor contract and a common carrier of property under the authority of the Federal Motor Carrier Safety Administration ("FMCSA"), an agency under the Department of Transportation ("DOT"). (Joint Stipulation of Facts (ECF No. 61), Stipulation No. 1.)[3] Defendants offer truckload transportation services for customers throughout the United States. (Stipulation No. 305.) Defendants contract with Coca-Cola to employ personnel qualified under Federal Motor Carrier Safety Regulations ("FMCSR"), including — without limitation — regulations at 49 C.F.R. §§ 382, 383, 391, 392 and 395 to facilitate transportation of products into and out of the Sandston facility. (Stipulation No. 307.)

The Sandston facility is a private facility, on private property and not open to public travel. (Stipulation No. 10.) Further, the Sandston facility is accessible only through a security checkpoint. (Stipulation No. 171.) Tractor-trailers coming to the yard at the Sandston facility must pass through

---

[2]    The Court will refer to both entities collectively for ease of reference.

[3]    Pursuant to this Court's Order (ECF No. 49), the parties timely submitted their Joint Stipulation of Facts (ECF No. 61). In accordance with that Order, the parties submitted a list of 336 facts divided into three distinct sections. Section I contained facts agreed upon by the parties, numbered 1 through 23. Section II contained facts identified by Plaintiffs that Defendants disputed, numbered 24 through 204. Section III contained facts identified by Defendants that Plaintiffs disputed, numbered 205 through 336. In each of the disputed sections, the parties included two columns labeled "Dispute Fact" and "Dispute Relevance," each with a check-box. While the parties indicated that they disputed both the underlying fact and its relevance in many instances, some entries merely indicated that the parties disputed the underlying fact's *relevance*. Accordingly, the Court will treat those underlying *facts* as agreed upon by the parties. Defendants disputed the relevance of any stipulation numbered 25 through 204, and Plaintiffs disputed the relevance of any stipulation numbered 205 through 336.

security. (Stipulation No. 172.) Product entering the Sandston facility includes various goods and property shipped from both Virginia and out of state. (Stipulation No. 2.) Between November 1, 2010, and June 30, 2014, Defendants transported loaded trailers for over 88,500 customer orders that went through the Sandston facility. (Stipulation No. 312.) Approximately 49% of those orders involved movement across state lines. (Stipulation No. 313.) Approximately 15,200 loads originated in Virginia, destined for another state; approximately 17,800 loads originated outside of Virginia, but were scheduled for delivery within Virginia; and approximately 1,200 loads both originated and ended in locations outside of Virginia, but passed through the Sandston facility. (Defs.' Mem. of Facts and Law In Supp. of Summ. J. ("Defs.' Mem.") (ECF No. 31) at 6.) All drivers that Defendants employed to work at the Sandston facility transported freight on the public highways at some point during their employment. (Stipulation No. 314.)

Defendants' job description for the position of driver provided in part that actual driving assignments of employees generally remained constant, but Defendants reserved the right to change an employee's assignment. (Stipulation No. 3.) Further, an actual driving assignment constituted a duty assignment only — not a separate job category — and could change at any time. (Stipulation No. 3.) Defendants employed drivers qualified to perform any driving assignment to ensure Defendants' priorities of customer satisfaction and highway safety. (Stipulation No. 209.) In doing so, Defendants ensured that any driver could provide driving services that Defendants needed to meet customer demand. (Stipulation No. 216.)

All drivers that Defendants employed were required to maintain a commercial motor vehicle driver's license. (Stipulation No. 222.) Before driving for Defendants, drivers had to pass an FMCSA physical in accordance with 49 C.F.R. § 391.41. (Stipulation No. 228.) Further, drivers had to pass a road test pursuant to 49 C.F.R. § 391.31 before driving for Defendants. (Stipulation No. 234.) Additionally, drivers were required to pass a written test on the DOT rules before driving

3

for Defendants. (Stipulation No. 240.) Defendants required that all drivers maintain medical authorization to drive pursuant to 49 C.F.R. § 391.43. (Stipulation No. 246.) Drivers were required to pass pre-employment controlled substance testing pursuant to 49 C.F.R. § 328.801, as well as FMSCA required alcohol and drug testing for purposes of compliance with 49 C.F.R. pts. 40 and 382. (Stipulation No. 252.) Defendants required that drivers comply with the record of violations requirement pursuant to 49 C.F.R. § 391.27. (Stipulation No. 270.) Finally, Defendants required drivers to maintain FMCSA Hours-of-Service logs pursuant to 49 C.F.R. pt. 395. (Stipulation No. 276.) Defendants further performed required investigations and inquiries on drivers as required by 49 C.F.R. § 391.23. (Stipulation No. 258.) Defendants performed an annual inquiry and review of driving records for its drivers in accordance with 49 C.F.R. § 391.25. (Stipulation No. 264.)

Drivers could be assigned to a variety of assignments, including: (1) road driving requiring transportation of freight throughout the country, (2) local driving requiring transportation of freight within a specific region, and (3) yard-jockeying requiring moving trailers around and within a customer's or Defendants' property to facilitate the loading and unloading of freight. (Stipulation No. 306.) Although drivers generally had primary assignments, any driver could be reassigned to a different assignment to meet customer demand. (Morgan 30(b)(6) Dep. (ECF No. 36-1) 97:1-7, June 19, 2014.) Any determination on changing an assignment could occur day-to-day. (Morgan 30(b)(6) Dep. 112:8-17.) This could happen every day for several days, or it could not happen for several months. (Morgan 30(b)(6) Dep. 112:17-19.) The ability to interchange the drivers in assignments allowed Defendants to succeed, and at any given time, a driver could be asked to do a different assignment. (Morgan 30(b)(6) Dep. 97:1-7, 12-17, 112:8-20.)

Defendants had approximately fifty employees at the Sandston facility. (LaPointe Dep. (ECF No. 36-2) 10:10-15, May 30, 2014.) Six routinely performed yard jockey duties, and another four to six filled-in on yard jockey duty. (LaPointe Dep. 24:13-19.) Defendants found it

consistently easier to pay yard jockeys an hourly rate, rather than a mileage rate paid to those making deliveries, because drivers performing yard jockey duty did not generate miles. (Morgan 30(b)(6) Dep. 110:19-111:5.) If a driver was absent, Defendants would not under normal circumstances pull a driver performing a yard jockey assignment to drive a route for the absent driver. (Stipulation No. 192.)

Defendants used a software package and database called the "TMW system" to track and record information on customer orders. (Stipulation No. 9.) The TMW system is designed to capture all deliveries from the Sandston facility, and driver deliveries are supposed to be tracked on the TMW system. (Stipulation Nos. 11, 12.)[4]

### B. Christopher Roberts

Plaintiff Christopher Roberts applied for a driver position with Defendants. (Stipulation No. 4.) Defendants hired Plaintiff Roberts as a driver and, during Plaintiff Roberts' employment with Defendants, he was qualified under the FMCSR to drive for Cowan. (Stipulation No. 4.) In 2007, Plaintiff Roberts began working full-time for Defendants as a driver. (Stipulation No. 13.)

Before driving for Defendants, Plaintiff Roberts was required to pass a written test administered by Defendants on the DOT rules. (Stipulation No. 240.) While employed with Defendants, Plaintiff Roberts was required to maintain a commercial motor vehicle driver's license.

---

[4]     Defendants provided voluminous TMW data attached to the Declaration of Dennis Morgan (ECF No. 31-2). Mr. Morgan provided a summary of TMW data for the Sandston facility between January 1, 2010, and June 30, 2014. (Morgan Decl. ¶ 21.) The summary provided the customer order number, move numbers associated with each transportation leg of the customer order, the origin city of each shipment, the final destination of each shipment, the delivery date and the driver identification code of the driver who operated each leg of the shipment. (Morgan Decl. ¶ 21.) Mr. Morgan provided a summary of any customer order that involved Plaintiffs between those dates. (Morgan Decl., Ex. 2 (ECF No. 34-1).) When referring to an individual Plaintiff's TMW data summary, the Court reviewed the information provided in the summary, restricted by that particular Plaintiff's identification code.

(Stipulation No. 223.) He also had to maintain FMSCA Hours-of-Service logs during his employment. (Stipulation No. 277.)

Plaintiff Roberts transported freight on public highways 290 times between January 1, 2010, and June 30, 2014, including trips in June 2012, September 2012 and January 2013. (Stipulation No. 211.) TMW data detailed that Plaintiff Roberts made deliveries originating in one state and ending in another on January 4, 2010, April 5, 2010, and May 23, 2010. (*See* Roberts TMW Summ.)[5] TMW data did not show that Plaintiff Roberts made any deliveries between May 23, 2010, and June 26, 2012. (*See* Roberts TMW Summ.)

In May 2012, Plaintiff Roberts had a car accident, making performing yard jockey duties difficult. (Stipulation No. 92.) After the accident, Plaintiff Roberts requested to go back to driving. (Stipulation No. 93.) Plaintiff Roberts then yard jockeyed three days per week and drove two days per week. (Stipulation No. 95.) TMW data revealed that Plaintiff Roberts delivered a shipment in Maryland on June 28, 2012. (*See* Roberts TMW Summ.) Between June 2012 and January 2013, Plaintiff Roberts regularly transported shipments across state lines to and from Maryland. (*See* Roberts TMW Summ.) On January 20, 2013, Plaintiff Roberts delivered a load originating in Burlington, New Jersey, and ending in Mechanicsville, Virginia. (*See* Roberts TMW Summ.)

Plaintiff Roberts brings claims for unpaid overtime compensation for two periods. First, Plaintiff Roberts seeks overtime compensation for the period beginning November 19, 2010, and ending May 5, 2012. (Pls.' Mem. in Supp. of Mot. for Partial Summ. J. ("Pls.' Mem.") (ECF No. 36) at 2.) Second, he seeks overtime compensation for the period beginning January 21, 2013, and ending November 1, 2013. (Pls.' Mem. at 2.)

---

[5]     TMW assigned to Plaintiff Roberts driver code "ROBP." (Morgan Decl. ¶ 22.)

## C. David Oakes

Plaintiff David Oakes applied for a driver position with Defendants. (Stipulation No. 5.) Defendants hired Plaintiff Oakes as a driver and, during Plaintiff Oakes' employment with Defendants, he was qualified under the FMCSR to drive for Defendants. (Stipulation No. 5.) Defendants hired Plaintiff Oakes as a "local driver," and he began his employment on April 19, 2011. (Stipulation Nos. 15, 16.)

Before his employment, Plaintiff Oakes was required to pass a written test administered by Defendants on the DOT rules. (Stipulation No. 242.) While employed by Defendants, Plaintiff Oakes was required to maintain a commercial motor vehicle driver's license. (Stipulation No. 224.) Further, he was required to maintain FMSCA medical authorization during his employment. (Stipulation No. 248.) Plaintiff Oakes also was required to maintain FMSCA Hours-of-Service logs throughout his employment. (Stipulation No. 278.)

Plaintiff Oakes transported freight on public highways during his employment 1,176 times between April 2011 and January 2014, including trips in April 2011, June 2011, August 2011, November 2011, January 2012, March 2012, May 2012 and July 2012. (Stipulation No. 212.) Beginning in April 2011 and ending in July 2012, TMW data recorded that Plaintiff Oakes regularly made deliveries originating in one state and ending in another, including to and from Alabama, Florida, Maryland, Pennsylvania and New Jersey. (*See* Oakes TMW Summ.)[6] TMW data shows that Plaintiff Oakes made a delivery in Maryland on July 1, 2012. (*See* Oakes TMW Summ.) According to TMW data, Plaintiff Oakes did not make any deliveries originating in one state and ending in another after that date. (*See* Oakes TMW Summ.)

Plaintiff Oakes has brought claims for unpaid overtime covering his employment during the period beginning July 3, 2012, and ending November 1, 2013. (Pls.' Mem. at 2.)

---

[6] TMW assigned to Plaintiff driver code "OAKD." (Morgan Decl. ¶ 22.)

### D.  Corey Green

Plaintiff Corey Green applied for a driver position with Defendants. (Stipulation No. 6.) Defendants hired Plaintiff Green as a driver and, during Plaintiff Green's employment with Defendants, he was qualified under the FMCSR to drive for Cowan. (Stipulation Nos. 6, 16.)  In 2008, Plaintiff Green began his employment as a local driver. (Stipulation No. 16.)

Before his employment, Plaintiff Green was required to pass a written test administered by Defendants on the DOT rules. (Stipulation No. 243.)  During his employment, Plaintiff Green was required to maintain a commercial motor vehicle driver's license. (Stipulation No. 225.) Additionally, he was required to maintain FMCSA medical authorization while employed by Defendants. (Stipulation No. 249.)  Plaintiff Green was also required to maintain Hours-of-Service logs during his employment. (Stipulation No. 279.)

After May 2009, Plaintiff Green was never asked to move a load or drive a truck outside of the Sandston facility. (Stipulation No. 204.)  While Plaintiff Green transported freight on public highways during his employment, Plaintiff Green had not done so between November 1, 2010, and June 30, 2014. (Stipulation No. 213; *see also* Morgan Decl., Ex. 2.)

Plaintiff Green has brought claims for unpaid overtime stemming from his employment beginning on November 19, 2010, and ending on November 1, 2013. (Pls.' Mem. at 2.)

### E.  Bruce Brooks

Plaintiff Bruce Brooks applied for a driver position with Defendants. (Stipulation No. 7.) Defendants hired Plaintiff Brooks as a driver and, during Plaintiff Brooks' employment with Defendants, he was qualified under FMCSRs to drive for Cowan. (Stipulation No. 7.)  On April 8, 2009, Plaintiff Brooks began his employment with Defendants as a local driver. (Stipulation No. 17.)

Before beginning his employment, Plaintiff Brooks was required to pass a written test administered by Defendants on the DOT rules. (Stipulation No. 244.) During his employment with Defendants, Plaintiff Brooks was required to maintain a commercial motor vehicle driver's license. (Stipulation No. 226.) Plaintiff Brooks maintained such a driver's license, as well as a hazardous material endorsement. (Stipulation No. 320.) Further, he was required to maintain FMCSA medical authorization during his employment. (Stipulation No. 250.) Plaintiff Brooks was also required to maintain FMSCA Hours-of-Service logs during his employment. (Stipulation No. 280.)

On January 4, 2010, Plaintiff Brooks delivered a shipment in Elkridge, Maryland, that originated in Richmond, Virginia. (*See* Brooks TMW Summ.)[7] Between that date and September 2010, Plaintiff Brooks regularly made deliveries originating in one state and ending in another, including trips to and from Maryland, New Jersey and Pennsylvania. (*See* Brooks TMW Summ.) TMW data shows that the last trip during this period for Plaintiff Brooks that originated in one state and concluded in another state occurred on September 17, 2010. (*See* Brooks TMW Summ.)

Plaintiff Brooks has brought claims for unpaid overtime stemming from his employment for two periods. First, he seeks overtime compensation from the period beginning November 19, 2010, and ending September 3, 2011. (Pls. Mem. at 2.) Second, he seeks overtime compensation from the period beginning September 1, 2013, and ending November 1, 2013. (Pls.' Mem. at 2.)[8]

F. Charles Jones

Plaintiff Charles Jones applied for a driver position with Defendants. (Stipulation No. 8.) Defendants hired Plaintiff Jones as a driver, and during Plaintiff Jones' employment with

---

[7]     TMW assigned to Plaintiff Brooks driver code "BROBR." (Morgan Decl. ¶ 22.)

[8]     Plaintiff Brooks settled his claims for unpaid overtime compensation for the period beginning September 4, 2011, and ending August 31, 2013. (Pls.' Mem. at 2.)

9

Defendants, he was qualified under the FMCSR to drive for Defendants. (Stipulation No. 8.) Defendants hired Plaintiff Jones in April 2010 as a driver. (Stipulation Nos. 22, 23.)

Before beginning his employment, Defendant Jones was required to pass a written test administered by Defendants on the DOT rules. (Stipulation No. 245.) During his employment with Defendants, Plaintiff Jones was required to maintain a commercial motor vehicle driver's license. (Stipulation No. 227.) Plaintiff Jones maintained such a driver's license as well as a hazardous material certification. (Stipulation No. 319.) Additionally, he was required to maintain FMSCA medical authorization during his employment. (Stipulation No. 251.) Plaintiff Jones was also required to maintain FMCSA Hours-of-Service logs during his employment. (Stipulation No. 281.)

TMW data shows that in mid-April 2010, Plaintiff Jones began hauling shipments originating in one state and destined for another state. (*See* Jones TMW Summ.)[9] This included trips to and from Maryland, New Jersey, New York and Pennsylvania. (*See* Jones TMW Summ.) TMW recorded that Plaintiff Jones' final trip that originated in one state and ended in another occurred on December 30, 2010, with the destination being Kitty Hawk, North Carolina. (*See* Jones TMW Summ.) Between January 4, 2011, and January 6, 2011, Plaintiff Jones made several trips wholly within Virginia. (*See* Jones TMW Summ.)

Plaintiff Jones seeks overtime compensation for two periods during his employment. First, he seeks overtime compensation for the period beginning January 1, 2011, and ending September 3, 2011. (Pls.' Mem. at 2.) Second, Plaintiff Jones seeks overtime compensation for the period beginning September 1, 2013, and ending November 1, 2013. (Pls.' Mem. at 2.)[10]

---

[9]     TMW assigned to Plaintiff Jones the driver code "JONCHARL." (Morgan Decl. ¶ 22.)

[10]    Plaintiff Jones settled his claims for unpaid overtime compensation for the period beginning September 4, 2011, and ending August 31, 2013. (Pls.' Mem. at 2.)

II. Standard of Review

A. Generally

A court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to summary judgment as a matter of law." Fed. R. Civ. P. 56(a). The relevant inquiry at the summary judgment stage analyzes "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). In reviewing a motion for summary judgment, the Court must view the facts in the light most favorable to the non-moving party. *Id.* at 255.

When considering a case for summary judgment, the Court cannot weigh the evidence to enter a judgment, but simply must determine if a genuine issue exists for trial. *Greater Balt. Ctr. for Pregnancy Concerns v. Baltimore*, 721 F.3d 264, 283 (4th Cir. 2013) (quoting *Anderson*, 477 U.S. at 249). Even on cross-motions for summary judgment, a court cannot resolve factual issues, it can only identify them. *Id.* (citing *Redd v. N.Y. State Div. of Parole*, 678 F.3d 166, 174 (2d Cir. 2012)).

Once a party properly makes and supports a motion for summary judgment, the opposing party has the burden of showing that a genuine dispute exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement provides that no genuine issue of material fact exists. *Anderson*, 477 U.S. at 247-48.

A material fact may affect the outcome of a party's case. *Id.*; *JKC Holding Co. v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001). Substantive law determines a fact's materiality, and "[o]nly disputes over facts that might affect the outcome of the suit under the

11

governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248;

*Hooven-Lewis v. Caladera*, 249 F.3d 259, 265 (4th Cir. 2001) (citing *Anderson*, 477 U.S. at 248).

Indeed, summary judgment must be granted if the non-moving party "fails to make a showing

sufficient to establish the existence of an element essential to that party's case, and on which that

party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Further, if the adverse party does not provide evidence "establishing that the fact finder could

reasonably decide in his favor, then summary judgment shall be entered regardless of [a]ny proof or

evidentiary requirements imposed by the substantive law." *Dash v. Mayweather*, 731 F.3d 303,

311 (4th Cir. 2013) (quoting *Bouchat v. Balt. Ravens Football Club*, 346 F.3d 514, 522 (4th Cir.

2003)) (alteration in original) (internal quotation marks omitted).  To defeat an otherwise properly

supported motion for summary judgment, the non-moving party must rely on more than conclusory

allegations, "mere speculation," the "building of one inference upon another," the "mere existence

of a scintilla of evidence," or the appearance of some "metaphysical doubt" concerning a material

fact. *Lewis v. City of Va. Beach Sheriff's Office*, 409 F. Supp. 2d 696, 704 (E.D. Va. 2006)

(citations omitted).  A "genuine" issue concerning a "material" fact only arises when the evidence,

viewed in the light most favorable to the non-moving party, sufficiently allows a reasonable jury to

return a verdict in that party's favor. *Anderson*, 477 U.S. at 248.

      B.  Ability to Resolve This Case

      Determining how an employee spends his time working under the Fair Labor Standards Act

("FLSA") is a question of fact; however, determining whether an employee's activities exclude him

from overtime benefits constitutes a question of law. *Icicle Seafoods, Inc. v. Worthington*, 475 U.S.

709, 714 (1986).  Accordingly, should the parties not dispute how employees spend their time

working, summary judgment warrants determination of the question of law — namely whether

Plaintiffs are entitled to overtime compensation.  Plaintiffs and Defendants agree that no dispute of

material fact exists, and, consequently, both assert that this Court may decide whether the MCE

applies to Plaintiffs in this case. (Pls.' Supplemental Br. in Supp. of Mot. for Partial Summ. J.

("Pls.' Supplemental Br.") (ECF No. 52) at 14-17; Supplemental Mem. in Supp. of Defs.' Mot. for

Summ. J. ("Defs.' Supplemental Br.") (ECF No. 53) at 17-19.)

III.  Discussion

A.  Fair Labor Standards Act

Congress enacted the FLSA to accomplish the goal of "outlawing from interstate commerce

goods produced under conditions that fall below minimum standards of decency." *Tony & Susan*

*Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 296 (1985).  The Supreme Court has directed courts

to interpret the FLSA broadly and in favor of coverage. *Id.*; *see also Monahan v. Cnty. of*

*Chesterfield*, 95 F.3d 1263, 1267 (4th Cir. 1996).

To that end, the FLSA requires that an employer pay an employee at a rate of time and a half

for any hours that an employee works in excess of forty hours in a workweek. 29 U.S.C.

§ 207(a)(1). Certain exceptions to the overtime pay requirement, however, do exist. *See id.* § 213.

While exemptions exist, courts must interpret those exceptions narrowly and against the employer

asserting such exemptions. *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392 (1960).

B.  Motor Carrier Act Exemption

One specific exception to the overtime pay requirement exempts employers from paying

overtime to "any employee with respect to whom the Secretary of Transportation has power to

establish qualifications and maximum hours of service pursuant to the provisions of [49 U.S.C.

§ 31502]." 29 U.S.C. § 213(b)(1).  The DOT may set the qualifications and maximum hours of

service for "employees of, and safety of operation and equipment of, a motor carrier," as well as

"employees of, and standards of equipment of, a private motor carrier." 49 U.S.C. § 31502(b)(1)-

(2). Courts have referred to this particular exemption as the Motor Carrier Act Exemption

("MCE"). *Songer v. Dillon Res., Inc.*, 636 F. Supp. 2d 516, 518 (N.D. Tex. 2009), *aff'd* 618 F.3d 467 (5th Cir. 2010). As part of the original FLSA, the MCE remains "in all material respects." *Troutt v. Stavola Bros., Inc.*, 107 F.3d 1104, 1107 (4th Cir. 1997).

To determine whether the MCE applies, therefore, courts must look to both the FLSA and the Motor Carrier Act. The Supreme Court has cautioned that in analyzing the MCE under the FLSA and Motor Carrier Act, courts must remember that the MCE, under § 213(b) of the FLSA and § 204 of the Motor Carrier Act, constitutes part of "important general statutes and their particular language should be construed in the light of the purposes which led to enactment of the entire legislation." *Southland Gasoline Co. v. Bayley*, 319 U.S. 44, 47 (1943) (citing *United States v. Am. Trucking Ass'ns*, 310 U.S. 534, 542 (1940)). Adopted first, the Motor Carrier Act regulated interstate transportation through an efficient system, at least part of which included safety regulations through setting maximum hours for drivers. *Id.* at 48 (citing *Maurer v. Hamilton*, 309 U.S. 598, 604 (1940)). Enacted later, the FLSA sought to eliminate substandard labor conditions, at least part of which included reducing hours to maintain employee health. *Id.* (citing *Overnight Motor Co. v. Missel*, 316 U.S. 572, 576-77 (1942); *United States v. Darby*, 312 U.S. 100, 115 (1941)).

Accordingly, because the FLSA exempted drivers covered by the Motor Carrier Act, Congress apparently relied upon the Motor Carrier Act to "work out satisfactory adjustments for employees charged with the safety of operations" in the transportation realm. *Southland Gasoline Co.*, 319 U.S. at 48. While the FLSA generally confers jurisdiction over workers to the Department of Labor ("DOL"), the MCE applies to the DOT's jurisdiction, and an individual cannot simultaneously fall under both the DOL's jurisdiction and the DOT's jurisdiction for purposes of the MCE. *Brennan v. Schwerman Trucking Co. of Va.*, 540 F.2d 1200, 2014 (4th Cir. 1976) (citing *Morris v. McComb*, 332 U.S. 422, 437-38 (1947); *Writz v. Caddell Transit Corp.*, 253 F. Supp. 378

14

(W.D. Okla. 1966)).  Further, the Court must turn to the DOT's interpretation of the MCE, rather than any interpretation by the DOL.  *See Benson v. Universal Ambulance Serv.*, 675 F.2d 783, 785 (6th Cir. 1982) ("It is clear that the agency with whose interpretation the exemption in issue is concerned is not the Department of Labor, but rather the Department of Transportation.").

Application of the MCE depends upon both the class of the employer and the class of work performed by the employee.  29 C.F.R. § 782.2(a).  First, the MCE applies to employers "whose transportation of . . . property by motor vehicle is subject to [the DOT's] jurisdiction."  *Id.*  Second, employees must "engage in activities of a character directly affecting the safety of the operation of motor vehicles in the transportation on the public highways of . . . property in interstate . . . commerce within the meaning of the Motor Carrier Act."  *Id.*

Regulations further detail that those employees engaged in the required safety-affecting activities participated in work as drivers, driver's helpers, loaders or mechanics.  *Id.* § 782.2(b)(1); *see also Pyramid Motor Freight Corp. v. Ispass*, 300 U.S. 695, 706-07 (1947) (noting that predecessor to the DOT defined its power both positively and negatively to include only those four classes).  "[N]o other class[]of employees . . . perform[s] duties directly affecting such 'safety of the operation.'"  29 C.F.R. § 782.2(b)(1).  Job title alone does not dictate whether the employee satisfies the second requirement.  *See Pyramid Motor Freight Corp.*, 300 U.S. at 707-08 ("[T]he Court shall not be concluded by the name which may have been given his position . . . .").  Rather, the character of the activities involved in performing the job controls the analysis.  *Id.*; 29 C.F.R. § 782.2(b)(2).

Generally, the MCE applies to an employee whose bona fide duties are such that he regularly or from time-to-time performed those safety-affecting activities, or such that he was likely to be called upon to perform those safety-affecting activities.  29 C.F.R. § 782.2(b)(3).  The general rule assumes that the continuing duties of an employee's job include performing safety-affecting

15

activities. *Id.*; *see also Songer v. Dillon Res., Inc.*, 618 F.3d 467, 475 (5th Cir. 2010) (citing 29

C.F.R. § 782.2(b)(3)) (emphasizing that drivers' continuing duties involved driving assignments).

In this case, the parties agree that Defendants satisfy the first requirement for application of

the MCE, namely that Defendants are subject to the DOT's authority under the Motor Carrier Act.

(Stipulation No. 1.) The parties disagree, however, on the application of the MCE to each

individual Plaintiff.

### C. DOT Interpretation

As noted above, the MCE exempts certain employees from the overtime requirements of the

FLSA. Further, application of the MCE turns on the DOT's jurisdiction over a given employee. In

assessing its jurisdiction, the DOT issued a Notice of Interpretation, stating that "evidence of

driving in interstate commerce or being subject to being used in interstate commerce should be

accepted as proof that the driver is subject to [the DOT's jurisdiction] for a 4-month period."

*Application of the Federal Motor Carrier Safety Regulations*, 49 Fed. Reg. 37902-2 (July 23, 1981).

Accordingly, driving in interstate commerce subjects a driver to the DOT jurisdiction and exempts

him from overtime compensation requirements for a four-month period. If a driver, however, has

not driven in interstate commerce, "evidence must be presented that the carrier has engaged in

interstate commerce and that the driver could reasonably have been expected to make one of the

carrier's interstate runs" to subject that driver to the DOT jurisdiction, thereby exempting him from

overtime compensation. *Id.*

The DOT interprets its authority in this manner, because the four-month period avoids a "too

strict" week-to-week analysis, as well as an overly broad analysis that subjects a driver to the DOT

jurisdiction for an unlimited timeframe. *Id.* Further, when a question exists as to whether a

particular employee falls within the classification, courts make the determination on an individual

basis. *Troutt*, 107 F.3d at 1108. Because safety is paramount, the DOT's power to regulate

16

determines whether the MCE applies, not whether the DOT has actually exercised such power. *Id.* at 1107.

As an initial matter, the DOT instructs that the interpretation of its jurisdiction covers "drivers." Consequently, determining whether an employee qualifies as a driver serves as a prerequisite to determining whether he falls under the MCE. Next, if evidence of interstate commerce exists, a driver generally would satisfy the MCE for a period of at least four months from that date. If, however, no evidence of actual participation in interstate commerce exists, the Court must determine whether those drivers "could reasonably have been expected to make one of the carrier's interstate runs." *Application of the Federal Motor Carrier Safety Regulations*, 49 Fed. Reg. 37902-2.

Plaintiffs argue that the DOT has replaced this Four-Month Rule with a "14/15 Day Rule." (Pls.' Supplemental Br. at 7-10.) Defendants contend that the DOT has not replaced its Four-Month Rule with a "14/15 Day Rule." (Defs.' Mem. in Resp. to Pls.' Supplemental Br. ("Defs.' Supplemental Resp.") (ECF No. 60) at 1-3.)

As an initial matter, the Court addresses Plaintiffs' contention that the DOT has downsized the Four-Month Rule to a "14/15 Day Rule." The Court then addresses application of the DOT Notice of Interpretation to Plaintiffs.

### 1. "14/15 Day Rule"

Plaintiffs argue that the DOT has replaced the four-month period with a "14/15 Day Rule." (Pls.' Supplemental Br. at 7-9.) Defendants respond that the DOT still applies its jurisdiction pursuant to a four-month period, and no "14/15 Day Rule" exists regarding the DOT's extension of jurisdiction. (Defs.' Supplemental Resp. at 1-3.)

Plaintiffs cite to FMCSR guidance on the FMCSA website in support of their argument. (Pls.' Supplemental Br. at 7.) A memorandum dated February 8, 2000, serves as the basis for this

alleged "14/15 Day Rule." *Part 390 Federal Motor Carrier Safety Regulations, Guidance*, http://www.fmcsa.dot.gov/regulations/title49/section/390.3?guidance (last visited October 14, 2014). This memorandum states that the case law discussed by the 1981 interpretation "clearly support[ed] an assertion of jurisdiction over a driver for four months after a single interstate trip." *Id.* The Four-Month Rule, however, was not necessary to prevent fatigue; accordingly, "in the interest of simplicity and workability" the memorandum moved to a "14/15 Day Rule." *Id.* Plaintiffs contend that the new national policy employed by the DOT will only extend jurisdiction for a seven- or eight-day period both before and after a trip in interstate commerce. (Pls.' Supplemental Br. at 7.)

This "14/15 Day Rule," however, exists as a "prudential limitation on the use of FMCSA authority, *not an interpretation of FMCSA jurisdiction.*" (Defs.' Supplemental Resp., Ex. 1 (ECF No. 58-2), Letter from Julie Anna Cirillo, Acting Deputy Administrator, FMSCA, to Michael Ginley, Director, Office of Enforcement Policy, Wage and Hour Division, U.S. Department of Labor ("Cirillo Letter") at 3 (emphasis added).)[11] The "14/15 Day Rule" meant to address "workability," and the FMCSA "continue[d] to believe that the [Motor Carrier Act] of 1935 confer[ed] jurisdiction over drivers during a 4-month period." (Cirillo Letter at 2.)[12]

Application of the MCE depends upon the DOT's jurisdiction to exercise its power, not upon whether the DOT actually has done so. *Troutt*, 107 F.3d at 1107. Accordingly, because Plaintiffs' supporting documentation specifically states that the "14/15 Day Rule" was not an interpretation on the limitation of the DOT's jurisdiction, the Court finds that the appropriate timeframe should be four months as provided in the DOT's Notice of Interpretation. *Application of the Federal Motor Carrier Safety Regulations*, 49 Fed. Reg. 37902-2; *see also Johnson v. Hix*

---

[11]     The Court takes judicial notice of the letter pursuant to Federal Rule of Evidence 201.

[12]     Notably, the author of both the letter and the memorandum upon which Plaintiffs rely is the same individual. (Cirillo Letter at 2 (noting that author of letter issued memorandum).)

*Wrecker Serv., Inc.*, 651 F.3d 658, 662 n.2 (7th Cir. 2011) (noting that the DOL as recently as 2010 acknowledged existence of the DOT's "four month rule").

### 2. Driver

Regulations define a "driver" as "an individual who drives a motor vehicle in transportation which is, within the meaning of the Motor Carrier Act, in interstate or foreign commerce." 29 C.F.R. § 782.3(a). Interstate commerce under the Motor Carrier Act includes transporting goods from one state to another. *See id.* § 782.7(b)(1) (noting that crossing state lines by motor vehicle constitutes interstate commerce under both the Motor Carrier Act and FLSA). An employer may also engage in interstate commerce through wholly intrastate transportation that constitutes part of the practical continuity of movement of the goods. *See Walling v. Jacksonville Paper Co.*, 317 U.S. 564, 568 (1943) (noting that interstate commerce not broken when stop at warehouse is part of "practical continuity of movement" of goods).

A court assesses an employee's job by looking at the employee's actual job activities and not just the title given to that employee. *Pyramid Motor Freight Corp.*, 300 U.S. at 706-07 ("[T]he Court shall not be concluded by the name which may have been given his position . . . ."). Further, the regulations recognize that a "driver" does not necessarily spend the entirety of his time driving in interstate commerce. 29 C.F.R. § 782.3(a). An employee, however, would not qualify as an exempt driver under the MCE if his job never included transportation in interstate commerce. *Id.* § 782.3(b). An isolated delivery in interstate commerce may be *de minimis* such that the employee still does not qualify as a driver; however, courts have hesitated to apply the *de minimis* principles in this context, because driving in interstate commerce significantly affects the safety of motor vehicle operations. *Compare Crooker v. Sexton Motors, Inc.*, 469 F.2d 206, 210 (1st Cir. 1972) ("The activities of one who drives in interstate commerce, however frequently or infrequently, are not trivial."), *and Sinclair v. Beacon Gasoline Co.*, 447 F. Supp. 5, 11 (W.D. La. 1976) ("[T]he *de*

19

*minimis* rule should seldom, if ever, be applied to one who drives a motor vehicle carrying property

. . . in interstate commerce."), *aff'd* 571 F.2d 978 (5th Cir. 1978), *with Coleman v. Jiffy June Farms,*

*Inc.*, 324 F. Supp. 664, 669 (S.D. Ala. 1970) (distinguishing other cases from case at bar by noting

that drivers in case at hand only had "occasional and minimal involvements with interstate

commerce").

### 3. "In fact" Analysis

As detailed in the DOT Notice of Interpretation, evidence of driving in interstate commerce

subjects an employee to the DOT's jurisdiction for purposes of the MCE for a four-month period.

*Application of the Federal Motor Carrier Safety Regulations*, 49 Fed. Reg. 37902-2. Accordingly,

should a driver have actually driven in interstate commerce, he will be exempt under the MCE for at

least a four-month period from that date.

### 4. "Reasonable Expectation" Analysis

To satisfy the "reasonable expectation" scenario, an employer first must show that it actually

participated in interstate commerce. *Application of the Federal Motor Carrier Safety Regulations*,

49 Fed. Reg. 37902-2. After showing that it participated in interstate commerce, the employer then

must show that the claimed employee could reasonably have been expected to make an interstate

delivery. *Id.*

#### a. Carrier Actually Participated in Interstate Commerce

First, the employer must show that it actually participated in interstate commerce. *Id.* In

this case, the parties do not dispute that between November 1, 2010, and June 30, 2014, Defendants

transported loaded trailers for over 88,500 customer orders that went through the Sandston facility.

(Stipulation No. 312.) Further, the parties do not dispute that approximately 49% of those orders

involved movement across state lines. (Stipulation No. 313.) Accordingly, Defendants satisfy the

first requirement that the carrier actually engaged in interstate commerce.

b. Driver Could Reasonably Have Been Expected to Make Interstate Delivery.

Next, the employer must show that the employee would have reasonably been expected to make one of the interstate trips. *Application of the Federal Motor Carrier Safety Regulations*, 49 Fed. Reg. 37902-2. While several courts have addressed the reasonable expectation requirement, none has articulated a bright-line rule in determining what constitutes such a reasonable expectation, and each has taken a broader approach, analyzing several factors. Accordingly, the Court believes that the employer's efforts to comply with federal requirements, the information conveyed from the employer to the employee, treatment of the entire group of employees and actual job performance of the individual employee all play important roles in determining whether an employee had a reasonable expectation to be called upon to drive in interstate commerce.

i. Carrier's Effort to Comply With Federal Requirements

Other courts have looked to certain licensing and certification that an employee keeps as part of his continued employment. Where the employee maintained the "DOT compliant licensing and medical certification at all times during his employment," the employer intended that the employee could be called upon for an interstate route. *Shoemaker v. United Parcel Servs., Inc.*, 2011 WL 836998, at *8 (D. Idaho 2011). Further, the current licensing and certifications did not contradict the premise that the employee understood that the employer could have assigned him an interstate route at any time. *Id.*

Another court interpreted that the DOT had jurisdiction over drivers where an employer asserted that all of its drivers kept all appropriate forms and requirements to conform to federal regulations and where the Federal Highway Safety Administration regularly performed audits to determine that drivers complied with federal safety requirements. *Garcia v. Pace Suburban Bus Serv.*, 955 F. Supp. 75, 77-78 (N.D. Ill. 1996). Additionally, compliance with federal regulations in record-keeping and drug and alcohol testing additionally weighed in favor of the conclusion that the

21

employees reasonably could have expected to engage in interstate activity. *Chao v. First Class Coach Co.*, 214 F. Supp. 2d 1263, 1275 (M.D. Fla. 2001).

### ii. Information Conveyed from Employer to Employee

Courts also look to employment documentation when determining whether a driver could reasonably been expected to be called upon to perform an interstate route. Combined with other factors, including efforts of the employer to comply with federal regulations, an employee who signed forms acknowledging that he may be called upon to perform interstate activity reasonably could expect to be called upon to perform interstate activity. *Garcia*, 955 F. Supp. at 77; *see also Gonzalez v. Smith Intern., Inc.*, 899 F. Supp. 2d 622, 635-36 (S.D. Tex. 2010) (finding that absent contrary evidence, signed agreement from employee weighed in favor of subjecting employees to MCE). Even an oral understanding between an employer and an employee that the employer expects that the employee can drive all routes offered by the employer, including interstate ones, helps to demonstrate that the employee could have reasonably expected to be called upon to perform an interstate route. *Chao*, 214 F. Supp. 2d at 1275; *see also Bishop v. Petro-Chem. Transp., LLC*, 582 F. Supp. 2d 1290, 1302 (E.D. Cal. 2008) (citing to acknowledgements by employees that they could be asked to perform interstate routes in support of conclusion that employees had reasonable expectation of being called upon for interstate route).

### iii. Treatment of the Entire Group

Courts will also look to the treatment of the entire group. Specifically, Courts look to the method of assignment of interstate routes among drivers. Generally, assigning interstate routes indiscriminately among drivers subjects all drivers to the MCE. *See Griffin v. Consolidated Foods Corp.*, 771 F.2d 826, 829 (4th Cir. 1985) (noting that even if drivers' product had been removed from interstate commerce employer could have indiscriminately assigned driver interstate route). Indiscriminate assignment helps to demonstrate that driving in interstate commerce is a "natural,

integral and . . . inseparable part" of an employee's job. *Morris*, 332 U.S. at 434. Indiscriminate assignment simply requires that at any time, Defendants could have assigned an interstate route to Plaintiffs. *See Griffin*, 771 F.2d at 829.

Even where the employer assigns relatively few interstate routes, the MCE applies where any driver could have received one of those routes. *See Morris*, 332 U.S. at 431-33 (finding that drivers exempt where only 4% of employer's business came in interstate commerce but any driver could have received interstate route). Further, even if only a few of the drivers actually have interstate trips assigned, the possibility that any one driver could get an interstate trip controls. *See Brennan*, 540 F.2d at 1204-05. In assessing whether employees meet the MCE, other courts consistently place great importance on an employer indiscriminately assigning interstate routes. *See, e.g., Griffin*, 771 F.2d at 829 ("[A]t any time, Consolidated could have reassigned interstate routes to Griffin . . . . We have held that where all the drivers are subject to the indiscriminate distribution of interstate service routes, the principle stated in *Morris* is controlling."); *Brennan*, 540 F.2d at 1204-05 ("[A]ll trips, whether interstate or intrastate, are given to drivers on an indiscriminate basis. . . . While it may be that in the instant case few of Schwerman's regular drivers have actually engaged in interstate cartage as a result of the manner in which individual hauls are assigned, we are nevertheless of opinion that the reasoning of the Court in *Morris* is no less applicable to the facts presented here."); *Dole v. Circle "A" Constr., Inc.*, 738 F. Supp. 1313, 1321 (D. Idaho 1990) ("Circle A should have been aware . . . that at least *some* of its employees (*i.e.*, those who were not making interstate hauls on an indiscriminate basis) were entitled to overtime compensation . . . .").

### iv. Actual Job Performance

Although used in determining whether or not an employee falls within one of the enumerated categories for the MCE, actual job activities inform a reasonable expectation. The

regulations recognize that a driver may not spend the entirety of his time actually driving in interstate commerce. 29 C.F.R. § 782.3(a). Mere transportation in intrastate commerce on its own may not bring a driver within the MCE, but helps to inform whether a driver may be subject to assignment of an interstate route. *See, e.g.*, *Griffin*, 771 F.2d at 829 (noting that even if drivers' product had been removed from interstate commerce employer could have indiscriminately assigned driver interstate route); *Brennan*, 540 F.2d at 1204 (noting that driver could have been assigned interstate route where both intrastate and interstate routes were pooled together before assignment through selection by drivers in order of seniority).

The DOT has stated, however, that it does not have jurisdiction over an employee that has no possibility or even a remote possibility of driving in an interstate route. *Application of the Federal Motor Carrier Safety Regulations*, 49 Fed. Reg. 37902-2. Although some courts have cautioned against applying a *de minimis* principle to a driver engaged in interstate commerce, an isolated delivery in interstate commerce could be disregarded as insufficient to trigger jurisdiction under the MCE. *Compare Crooker*, 469 F.2d at 210, *and Sinclair*, 447 F. Supp. at 11, *with Coleman*, 324 F. Supp. at 669. Accordingly, a driver actually making a delivery and potentially being subject to assignment of an interstate route weighs in favor of a finding that a driver could reasonably have been expected to make an employer's interstate run.

c. Analytical Framework

The Court will address Plaintiffs' claims in the following manner. First, the Court will determine whether each Plaintiff qualified as a driver. If the individual Plaintiff qualified as a driver, the Court will then determine whether the MCE applies to each Plaintiff under the DOT's Notice of Interpretation's "in fact" analysis. Finally, the Court will determine whether the MCE applies to each Plaintiff under the DOT Notice of Interpretation's "reasonable expectation" analysis. In assessing the "reasonable expectation" analysis, the Court will apply a framework to each

Plaintiff individually; however, the framework will conform to the requirements of the Notice of Interpretation and apply the four factors described above.

To satisfy the "reasonable expectation" analysis, the employer first must have actually engaged in interstate commerce. *Application of the Federal Motor Carrier Safety Regulations*, 49 Fed. Reg. 37902-2. The parties do not dispute that Defendants actually engaged in interstate commerce, thereby satisfying the first requirement. (Stipulation Nos. 313-14.) Moving to the four factors outline above, Defendants made efforts to comply with federal requirements. The parties do not dispute that drivers had to pass an FMSCA physical in accordance with 49 C.F.R. § 391.41 before driving, that drivers had to pass a road test pursuant to 49 C.F.R. § 391.31 before driving, that drivers were required to maintain medical authorization to drive pursuant to 49 C.F.R. § 391.43, that drivers had to pass pre-employment controlled substance testing pursuant to 49 C.F.R. § 328.801 and that Defendants performed required investigations and inquiries on drivers as required by 49 C.F.R. § 391.23. (Stipulation Nos. 228, 234, 246, 252, 258.) The parties do not dispute that drivers had to pass FMSCA required alcohol and drug testing for purposes of compliance with 49 C.F.R. pts. 40 and 382, and that Defendants performed an annual inquiry and review of driving records for its drivers in accordance with 49 C.F.R. § 391.25. (Stipulation Nos. 252, 264.) Finally, the parties do not dispute that Defendants required that drivers comply with the record of violations requirement pursuant to 49 C.F.R. § 391.27, and that drivers maintain FMSCA Hours-of-Service logs pursuant to 49 C.F.R. pt. 395. (Stipulation Nos. 270, 276.)

Second, the parties do not dispute that Defendants conveyed significant information to Plaintiffs. Specifically, the job description for the position of driver noted that an actual driving assignment constituted a duty assignment only and could change at any time. (Stipulation No. 3.) Additionally, the description provided that although the actual driving assignments would generally remain constant, Defendants reserved the right to change an employee's assignment. (Stipulation

No. 3.)[13]  The parties further do not dispute that two of the three possible assignments included hauling freight, either regionally or throughout the country.  (Stipulation No. 306.)

Third, treatment of the entire group informs as to the reasonable expectation.  Defendants had approximately fifty employees at the Sandston facility, with six routinely performing yard jockey duty and another four to six routinely filling-in.  (LaPointe Dep. 10:10-15, 24:13-19.) Although Defendants' drivers had their primary roles, any driver could be moved to a different assignment, including deliveries, to meet a customer's need on any given day.  (Morgan 30(b)(6) Dep. 97:1-7, 12-17.)  Any determination on moving someone performing a yard jockey primary assignment to some other assignment could occur day-to-day.  (Morgan 30(b)(6) Dep. 112:8-17.) This could happen every day for several days, or it could not happen for several months.  (Morgan 30(b)(6) Dep. 112:17-19.)  The parties do not dispute, however, that Defendants would not under normal circumstances pull a yard jockey to drive a route for the absent driver.  (Stipulation No. 192.)  Further, Defendants found it consistently easier to pay yard jockeys an hourly rate, rather than a by-the-mile rate for drivers making deliveries.  (Morgan 30(b)(6) Dep. 111:2-5.)  While not as strong as a completely random assignment of driving and interstate routes, the ability to change a driver's assignment at any time, at a minimum, demonstrated that Defendants could have assigned Plaintiffs an interstate route at any point.

Fourth, Plaintiffs' actual job performances all give insight as to whether Plaintiffs could reasonably expect to be called upon to make an interstate run.  The parties do not dispute that Defendants hired each Plaintiff as a driver, and each Plaintiff began his employment as a driver. (Stipulation Nos. 4-8.)  Each Plaintiff was qualified under the FMCSR during his employment. (Stipulation Nos. 4-8.)  Additionally, all Plaintiffs had to pass a written test administered by Defendants on the DOT rules.  (Stipulation Nos. 241-45.)  Every Plaintiff was required to maintain

---

[13]     While job title and job description certainly do not control the analysis, both inform as to an employee's reasonable expectation.

a commercial driver's license during his employment. (Stipulation Nos. 223-27.) Each Plaintiff

had to maintain FMSCA Hours-of-Service logs during his employment. (Stipulation Nos. 277-81.)

Finally, at some point during their employment, every Plaintiff made deliveries outside of the

Sandston facility. (Stipulation Nos. 211, 212, 213; Brooks TMW Summ.; Jones TMW Summ.)

      Against this backdrop, the Court will apply the following framework to determine whether

the MCE applied to Plaintiffs. Where a Plaintiff has regularly engaged in interstate deliveries but at

a point ceased making deliveries, the DOT's jurisdiction applies to that Plaintiff for a four-month

period from the date of the final delivery, whether intrastate or interstate.[14] Applying the four-

factors outlined above, the Court determines that these Plaintiffs could reasonably expect to make

one of Defendants' interstate runs four months after the date of his final delivery, thereby extending

the DOT's jurisdiction over a Plaintiff for a second four-month period. If after four months a

Plaintiff has not made a delivery, he no longer could reasonably be expected to engage in additional

interstate runs and, therefore, the DOT's jurisdiction will expire after eight months from a

Plaintiff's final delivery.

      Indeed, if a Plaintiff has not made a delivery in either intrastate or interstate commerce after

four months, the Court questions whether an employee would even still qualify as a driver under the

regulations, because that employee's bona fide duties probably do not include driving "in interstate

or foreign commerce" either "regularly or from time-to-time." 29 C.F.R. §§ 782.3(a), 782.3(b)(3).

---

[14]    If a Plaintiff's final delivery occurred in interstate commerce, the four-month period extends
under the "in fact" analysis. If the final delivery occurred in intrastate commerce, the four-month
period extends under the "reasonable expectation" analysis. Courts have long recognized that a
driver making an intrastate delivery while being subject to indiscriminate assignment of interstate
routes qualifies for the MCE, because that employee could reasonably have expected to make one
of the employer's interstate runs. *See Morris*, 332 U.S. at 431-33 (finding that drivers exempt
where only 4% of employer's business came in interstate commerce but any driver could have
received interstate route); *Griffin*, 771 F.2d at 829 (noting that even if driver's delivery not in
interstate commerce, employer could have assigned interstate route); *Brennan*, 540 F.2d 1204-05
(whether or not driver made actual interstate delivery not controlling where employer assigned
interstate hauls indiscriminately).

And, if an employee has not made a delivery after the DOT's jurisdiction ends eight months after a final delivery, the Court seriously doubts that the employee's bona fide duties include engagement in interstate commerce as required under the regulations.

### d. Analysis of Individual Plaintiffs

In assessing whether each Plaintiff reasonably could have been called upon, this Court must look at each Plaintiff individually. *Troutt*, 107 F.3d at 1108. Plaintiffs first argue that Defendants employ Plaintiffs as "yard jockeys" and not drivers; therefore, Defendants fail to meet even the initial requirement for showing that the MCE exempts Plaintiffs from overtime pay. (Pls.' Mem. at 20-26.) Defendants contend that they employed Plaintiffs as drivers who made interstate trips or were subject to making such interstate trips, thereby exempting Defendants from paying overtime pay to Plaintiffs. (Defs.' Mem. at 17-22.)[15]

As an initial matter, Plaintiffs admit that at some point, Defendants employed each Plaintiff as a driver. (Pl.'s Mem. at 20.) Plaintiffs argue, however, that they have not brought claims for overtime pay for periods in which they performed solely "yard jockey" assignments. (Pls.' Reply Br. in Supp. of Partial Summ. J. ("Pls.' Reply") (ECF No. 44) at 10-11.)[16] But, to look at only those

---

[15]    Defendants also argue that Plaintiffs activities during their yard jockey assignment constituted safety-affecting activity, subjecting Plaintiffs to the DOT's jurisdiction. (Defs.' Supplemental Br. at 5.) Defendants do not specify, however, whether these alleged safety-affecting activities render Plaintiffs drivers' helpers, loaders or mechanics. Because the MCE only applies to those four categories of employees, the Court only addresses whether Plaintiffs are drivers. *See* 29 C.F.R. § 782.2(b)(1) (noting that MCE applies only to those four categories of workers); *see also Pyramid Motor Freight Corp.*, 300 U.S. at 706-07 (noting that predecessor to the DOT defined its power both positively and negatively to include only those four classes).

[16]    Plaintiffs emphasize that Defendants' differentiate the pay label given to drivers performing yard jockey duties. (Pls.' Mem. at 6.) Defendants show that they must place different labels on pay for assignments, because Defendants pay drivers performing yard jockey assignments by the hour, while Defendants pay drivers making deliveries by the mile. (Morgan 30(b)(6) Dep. 110:2-111:5.) Because drivers performing yard jockey duty do not generate miles as drivers making deliveries do, Defendants find it consistently easier to pay yard jockeys an hourly rate. (Morgan 30(b)(6) Dep. 111:2-5.) The Court disagrees with Plaintiffs' assertion to the extent that the different pay labels demonstrate that Plaintiffs are not drivers; however, given that Defendants pay those performing

periods would disregard the recognition that drivers need not spend the entirety of their employment driving in interstate commerce. *See* 29 C.F.R. § 782.3(a). Accordingly, the Court must look beyond simply the claims period to determine whether Defendants employed Plaintiffs as drivers.

Second, Plaintiffs argue that they did not make any actual interstate deliveries during their claims period. (Pls.' Resp. to Defs.' Mot. for Summ. J. ("Pls.' Resp.") (ECF No. 40) at 11.) Defendants contend that Plaintiffs made deliveries in interstate commerce subjecting Plaintiffs to the DOT's jurisdiction. (Defs.' Mem. at 17-18.)

Finally, Plaintiffs argue that even if they were drivers, they were not likely to be called upon to make a delivery in interstate commerce. (Pls.' Mem. at 27-30.) Defendants argue, however, that Plaintiffs reasonably could have expected to deliver in interstate commerce. (Defs.' Mem. at 18-22.)

### i. Christopher Roberts

In this case, Plaintiff Roberts served a driver for Defendants. The parties do not dispute that Plaintiff Roberts transported freight on public highways approximately 290 times during his employment, including a trip as recently as January 2013. (Stipulation No. 211.) TMW records indicate that Plaintiff Roberts made deliveries originating in one state and ending in another state in January, April and May of 2010, as well as regularly between June 2012 and January 2013. (*See* Roberts TMW Summ.) Because the parties do not dispute that Defendants hired Plaintiff Roberts as a driver and Plaintiff Roberts' actual job activities included transporting freight on the public highways in interstate commerce, Defendants employed Plaintiff Roberts as a driver. *See* 29 C.F.R. § 782.3(a).

The parties do not dispute that Plaintiff Roberts transported freight on public highways approximately 290 times after January 1, 2010, including trips in June 2012, September 2012 and

yard jockey duty by the hour for consistency purposes, payment method does go to the "reasonable expectation" analysis.

January 2013. (Stipulation No. 211.) Between January 4, 2010, and May 23, 2010, Plaintiff

Roberts made at least four deliveries in interstate commerce. (*See* Roberts TMW Summ.) Plaintiff

Roberts made an actual interstate run on May 23, 2010. (*See* Roberts TMW Summ.) TWM data

shows that Plaintiff Roberts made no deliveries in the eight-month period following his final

interstate delivery on May 23, 2010. Accordingly, under the framework outlined above, the DOT's

jurisdiction over Plaintiff Roberts and application of the MCE ended on January 23, 2011, and he is

entitled to overtime beginning on January 24, 2011.

TMW data shows that Plaintiff Roberts' next delivery assignment occurred on June 26,

2012. (*See* Roberts TMW Summ.) On that date, Plaintiff Roberts again began making deliveries

and could have reasonably expected to make one of Defendant's interstate runs on that date. (*See*

Roberts TMW Summ.) From that date forward, Plaintiff regularly made both intrastate and

interstate deliveries. TMW data shows that Plaintiff Roberts made several deliveries each month,

both in intrastate and interstate commerce, between June 26, 2010, and January 17, 2013. Plaintiff

Roberts' final delivery in interstate commerce occurred on January 20, 2013. (*See* Roberts TMW

Summ.) TWM data shows that Plaintiff Roberts made no deliveries in the eight-month period

following his final interstate delivery on January 20, 2013. Accordingly, under the framework

outlined above, the DOT's jurisdiction over Plaintiff Roberts ended on September 20, 2013, and he

is entitled to overtime beginning on September 21, 2013.

Accordingly, the MCE applied to Plaintiff Roberts during his claims period between

November 19, 2010, and January 23, 2011, and between January 21, 2013, and September 21, 2013.

The MCE did not apply to Plaintiff Roberts on those other dates during his claims period.

### ii. David Oakes

Defendants employed Plaintiff Oakes as a driver. The parties do not dispute that during his

employment, Plaintiff Oakes transported freight on public highways approximately 1,176 times

during his employment, including as recently as July 2012. (Stipulation No. 212.) Indeed, TMW data shows that Plaintiff Oakes made deliveries originating in one state and ending in another state regularly between April 2011 and July 2012. (*See* Oakes TMW Summ.) Because the parties do not dispute that Defendants hired Plaintiff Oakes as a driver and Plaintiff Oakes' actual job activities included transporting freight on the public highways in interstate commerce, Defendants employed Plaintiff Oakes as a driver. *See* 29 C.F.R. § 782.3(a).

The parties do not dispute that Plaintiff Oakes transported freight on the public highways in July 2012. (Stipulation No. 212.) TMW data shows that Plaintiff Oakes made multiple deliveries each month, both intrastate and interstate, between April 2011 and July 2012. (*See* Oakes TMW Summ.) Plaintiff Oakes delivered an order from Williamsburg, Virginia, to Baltimore, Maryland, on July 1, 2012. (*See* Oakes TMW Summ.) TWM data shows that Plaintiff Oakes made no deliveries in the eight-month period following his final delivery on July 1, 2012. Accordingly, under the framework outlined above, the DOT's jurisdiction over Plaintiff Oakes and application of the MCE ended on March 1, 2013, and he is entitled to overtime beginning on March 2, 2013.

Accordingly, the MCE applied to Plaintiff Oakes during his claims period between July 3, 2012, and March 1, 2013. The MCE did not apply to Plaintiff Oakes during the other dates during his claims period.

### iii. Corey Green

In this case, Defendants did not employ Plaintiff Green as a driver during the relevant time period. In 2008, Plaintiff Green began his employment as a local driver. (Stipulation No. 16.) The parties do not dispute that Plaintiff Green was never asked to move a load or drive a truck outside of the Sandston facility after May 2009. (Stipulation No. 204.) Further, the parties do not dispute that Plaintiff Green has not transported freight on public highways from November 1, 2010, until the commencement of this suit. (Stipulation No. 213; *see also* Morgan Decl., Ex. 2.)

31

Although the regulations recognize that a "driver" does not necessarily spend the entirety of his time driving in interstate commerce, an employee that *never* transports in interstate commerce will not be exempt under the MCE. 29 C.F.R. § 782.3(a)-(b). Although Plaintiff Green did start as a driver and maintained the title of driver, Plaintiff Green's actual work activities have not included transporting freight in interstate commerce for several years, dating at least to January 1, 2010.[17] The parties do not dispute that Plaintiff Green had not transported freight on the public highways — in either intrastate or interstate commerce — for an uninterrupted period of at least three years before commencement of this suit. (Stipulation No. 213.) Because the parties do not dispute that Plaintiff Green has not transported freight on the public highways in interstate commerce, Plaintiff Green's bona fide duties do not include those of a "driver" as required for the MCE. *See* 29 C.F.R. § 782.2(b)(3) (noting that MCE applies if bona fide duties of the job performed are such that he either "regularly or from time-to-time" performed work of driver). Accordingly, because Plaintiff Green's bona fide duties were not that of a "driver," he was not exempt under the MCE. *See Pyramid Motor Freight Corp.*, 300 U.S. at 706-07 (noting that MCE only applies to four specific categories of workers).

As noted above, TMW data indicates that Plaintiff Green made no deliveries from at least January 1, 2010. (*See* Morgan Decl., Ex. 2.) Under the same framework outlined above, even assuming, *arguendo*, that Plaintiff Green was a driver and had made a qualifying delivery before that date, TMW data shows that Plaintiff Green made no delivery in the first eight months of 2010. Accordingly, the DOT jurisdiction and application of the MCE to Plaintiff Green would have

---

[17]     As noted above, the TMW Data Summary contains information regarding shipments that had delivery dates beginning January 1, 2010. The TMW Data Summary contains no record of Plaintiff Green engaging in *any* deliveries, much less ones originating in one state and ending in another. Accordingly, not only has Plaintiff Green not actually engaged in interstate commerce since at least that time, but also he likely has not since even earlier, given that the parties stipulated that he had not been "asked" to leave the Sandston yard since May 2009.

expired, at the latest, August 31, 2010, and he would be entitled to overtime compensation from September 1, 2010. Because Plaintiff Green seeks overtime compensation from November 19, 2010, his claims period remains unaffected by any potential application of the MCE under the framework outlined above.

### iv. Bruce Brooks

In this case, Defendants employed Plaintiff Brooks as a driver. The parties do not dispute that on April 8, 2009, Plaintiff Brooks began his employment as a local driver. (Stipulation No. 17.) TMW data shows that Plaintiff regularly made deliveries originating in one state and ending in another state until mid-September 2010. (*See* Brooks TMW Summ.) Because the parties do not dispute that Defendants hired Plaintiff Brooks as a driver and that Plaintiff Brooks' actual job activities included transporting freight on public highways in interstate commerce, Defendants employed Plaintiff Brooks as a driver. *See* 29 C.F.R. § 782.3(a).

Plaintiff Brooks made multiple deliveries each month, both intrastate and interstate, between January 2010 and September 2010. (*See* Brooks TMW Data.) TMW data shows that Plaintiff Brooks made his final delivery in interstate commerce on September 17, 2010. (*See* Brooks TMW Summ.)[18] TWM data shows that Plaintiff Brooks made no deliveries in the eight-month period following his final delivery on September 17, 2010. Under the framework outlined above, the DOT's jurisdiction over Plaintiff Brooks and application of the MCE ended on May 17, 2011, and he is entitled to overtime beginning on May 18, 2011.

---

[18]     TMW data shows that Plaintiff Brooks made one interstate delivery from Salisbury, Maryland to the Sandston facility on November 26, 2013. (*See* Brooks TMW Data Summ.) This interstate movement, however, falls outside of Plaintiff Brooks' claims period.

Accordingly, the MCE applied to Plaintiff Brooks during his claims period between November 19, 2010 and May 17, 2011.[19]

### v. Charles Jones

In this case, Defendants employed Plaintiff Jones as a driver. The parties do not dispute that Defendants hired Plaintiff Jones in April 2010 as a driver. (Stipulation Nos. 22, 23.) TMW data shows that between April and December 2010, Plaintiff Jones regularly made deliveries originating in one state and ending in another state. (*See* Jones TMW Summ.) Additionally, in December 2012, Plaintiff Jones made a delivery originating in Winchester, Virginia, that ended at the Sandston facility. (*See* TMW Summ.) Because the parties do not dispute that Defendants hired Plaintiff Jones as a driver and that Plaintiff Jones' actual job activities included transporting freight on the public highways in interstate commerce, Defendants employed Plaintiff Jones as a driver. *See* 29 C.F.R. § 782.3(a).

Plaintiff Jones made multiple deliveries each month, both intrastate and interstate, between April 2010 and January 2011. (*See* Jones TMW Summ.) TMW data recorded that Plaintiff Jones delivered a shipment originating in Sandston and ending in Kitty Hawk, North Carolina, on December 30, 2010. (*See* Jones TMW Summ.) Plaintiff Jones made several intrastate deliveries after December 30, 2010, and he made his final delivery on January 6, 2011. (*See* Jones TMW Summ.) TWM data shows that Plaintiff Jones made no deliveries in the eight-month period following his final delivery on January 6, 2011. Accordingly, under the framework outlined above,

---

[19]     Defendants argue that Plaintiff Brooks waived his claims to overtime compensation in a previous settlement. (Defs.' Mem. at 25-29.) The Court finds Defendants' argument unavailing. Plaintiff Brooks' WH-58 form states that he settled and received compensation for the period beginning September 10, 2011, and ending August 31, 2013. (ECF No. 36-25.) The form goes on to state clearly that Plaintiff Brooks had "given up the right . . . to bring suit on [his] own behalf for the payment of such . . . unpaid overtime compensation *for the period of time indicated above.*" (ECF No. 36-25 (emphasis added).) Accordingly, Plaintiff Brooks has not waived his right except for that specific period indicated in his WH-58 form.

the DOT's jurisdiction over Plaintiff Brooks and application of the MCE ended on September 6, 2011, and he is entitled to overtime beginning on September 7, 2011.[20]  However, Plaintiff Jones is only entitled to overtime pay during his claims period of September 1, 2013, through November 1, 2013, as a result of his settlement in an earlier case that covered the time period of September 10, 2011, to August 31, 2013.[21]

IV. Conclusion

For the reasons set forth above, the Court GRANTS in part and DENIES in part Defendant's Motion (ECF No. 30), and GRANTS in part and DENIES in part Plaintiff's Motion (ECF No. 35). The MCE applied to Plaintiff Roberts during his claims period between November 19, 2010, and January 23, 2011, and between January 21, 2013, and September 21, 2013.  Plaintiff Roberts is

---

[20]    TMW data shows that after January 5, 2011, Plaintiff Jones made a single, intrastate delivery on December 26, 2012. Even if the Court determined that this purely intrastate delivery triggered application of the MCE to Plaintiff Jones, TMW data shows that Plaintiff Jones made no deliveries in the eight-month period following the purely intrastate delivery. (*See* Jones TMW Summ.)  Accordingly, under the Court's analysis, the DOT's jurisdiction and application of the MCE to Plaintiff Jones would have ended on August 26, 2013, and Plaintiff Jones would have been entitled to overtime pay beginning August 27, 2013.  Because Plaintiff Jones seeks overtime compensation from September 1, 2013, any application of the MCE from Plaintiff's delivery on December 26, 2012, leaves Plaintiff Jones' claims period unaffected.  Additionally, this single, intrastate delivery could be subject to *de minimis* analysis. *See Coleman*, 324 F. Supp. at 669 (noting that drivers interstate activities were minimal). *But see Crooker*, 469 F.2d at 210 (noting that driving in interstate commerce cannot be trivial); *Sinclair*, 447 F. Supp. at 11 (noting that *de minimis* principle should "seldom, if ever," apply to drivers)

[21]    Defendants argue that the earlier settlement also covers the claims period here. (Defs.' Mem. at 25-29.)  However, the Court finds Defendants' argument unavailing. Plaintiff Jones' WH-58 form states that he settled and received compensation for the period beginning September 10, 2011, and ending August 31, 2013. (ECF No. 36-24.)  The form goes on to state clearly that Plaintiff Jones had "given up the right . . . to bring suit on [his] own behalf for the payment of such . . . unpaid overtime compensation *for the period of time indicated above.*" (ECF No. 36-24 (emphasis added).)  Accordingly, Plaintiff Jones has not waived his right except for that specific period indicated in his WH-58 form.

entitled to overtime compensation from January 24, 2011, until May 5, 2012, and from September 22, 2013, until November 1, 2013.[22]

The MCE applied to Plaintiff Oakes during his claims period between July 3, 2012, and March 1, 2013.  Plaintiff Oakes is entitled to overtime compensation from March 2, 2013, until November 1, 2013.

The MCE applied to Plaintiff Green at no point during his claims period.  Plaintiff Green is entitled to overtime compensation for his entire claims period from November 19, 2010, until November 1, 2013.

The MCE applied to Plaintiff Brooks during his claims period between November 19, 2010 and May 17, 2011.  Plaintiff Brooks is entitled to overtime compensation from May 18, 2011, until September 3, 2011, and from September 1, 2013, until November 1, 2013.

The MCE applied to Plaintiff Jones during his claims period between January 7, 2011, and September 3, 2011.  Plaintiff Jones is entitled to overtime compensation from September 1, 2011, until November 1, 2013.

Let the Clerk file this Memorandum Opinion electronically and notify all counsel accordingly.  An appropriate Order shall issue.[23]

It is so ORDERED.

                                                    /s/
                                                    David J. Novak
                                                    United States Magistrate Judge

Richmond, Virginia
Date: October 14, 2014

---

[22]    The Court does not undertake to calculate damages at this time.  The parties should work to calculate an agreed damages calculation in accordance with this Memorandum Opinion.  The Court will decide any disputes between the parties regarding such calculation.

[23]    Because the Court previously denied Defendants' Motion for Summary Judgment as to Plaintiffs' retaliation claims and because Plaintiffs did not seek summary judgment on their retaliation claim, Count II remains to be resolved by trial.